United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-4111

_____

Wilcox Electric, Inc.,        *
                                         *

     Petitioner,           *   Petition for Review of a
                                         *   Final Order from the Federal
     v.                   *   Aviation Administration.
                                         *

Federal Aviation Administration and   *
United States of America,      *
                                         *

     Respondents.        *
                                       *

_____      *
                                       *

Hughes Aircraft Company,     *
                                       *

     Intervenor on Appeal.  *

_____

Submitted:  April 16, 1997

Filed:  July 14, 1997

_____

Before LOKEN, MAGILL, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

After a government agency terminated a multimillion-dollar contract with the appellant due to performance problems, the agency awarded the contract to another firm. The appellant protested the manner in which the agency awarded the second contract, but not the termination of the first, in an administrative adjudication. After the agency denied the protest, the appellant sought review from this court. We dismiss the appeal for lack of standing.

I.

In August, 1995, the Federal Aviation Administration ("FAA") awarded a multimillion-dollar contract to Wilcox Electric, Inc. ("Wilcox"), to develop and install a navigational system known as the Wide Area Augmentation System ("WAAS"). The aim of the project was to modify and upgrade a satellite-based navigational system currently used by the military so that it could serve as the nation's primary flight-control system for civil aircraft. The FAA awarded the WAAS contract to Wilcox after issuing a request for proposals and evaluating the five proposals that it received. Wilcox's proposal, which included Hughes Aircraft Company ("Hughes") as a subcontractor who would be the primary software developer, outscored each of the other proposals and, in particular, received excellent scores for its software development capabilities.

Although the parties dispute the cause of the subsequent problems, they agree that Wilcox encountered numerous and significant difficulties in performing the WAAS contract almost immediately after it was agreed to. As early as September, 1995, for example, the FAA notified Wilcox of its dissatisfaction with Wilcox's ability to meet initial goals. From the beginning, one of the FAA's main concerns was with software development. The FAA employee responsible for software development attributed the problems not to Hughes, but rather to Wilcox, which, he believed, would not give Hughes the authority to correct problems that arose.

Wilcox's difficulties increased, and late in January, 1996, the FAA met with Wilcox to discuss them. As a result of this meeting, the FAA convened a second meeting in February, 1996, to evaluate the options available to it if Wilcox's performance difficulties persisted. From that meeting, ten options emerged, but the FAA did not investigate them further at that time because review of an important contract milestone was scheduled for the next month. Although Wilcox had already delayed this review for three months (it had originally been scheduled for December, 1995), it was unable to pass the review when it occurred. Wilcox's score was so low, moreover, that out of a possible "award fee" of over $5 million that the contract provided for, it received nothing.

The FAA therefore sent Wilcox a letter notifying it of deficiencies in ten areas, including cost and schedule reporting, systems engineering, hardware selection and approval, software, and several aspects of management. The letter also specified the corrective action required of Wilcox for each deficiency, and set a deadline for compliance. After the FAA found Wilcox's response to its notice unacceptable in a number of major ways, it decided to terminate the contract. At that point, eight months into the contract, the FAA projected that there would be a ten-month delay in the completion date and that Wilcox would spend an estimated $100 million over budget if it continued as contractor.

After the FAA terminated the contract, it reviewed the options discussed at the February meeting, re-evaluated the original five bidders, and explored new alternatives. The FAA then decided to award a second, similar contract to Hughes, based on its familiarity with the project, its performance in the past eight months on the software development for the WAAS, and its success in developing a somewhat similar project for the Air Force. This contract was awarded on a single-source basis, that is, without open bidding.

Unhappy with these events, Wilcox filed a protest of the award to Hughes with the FAA's Office of Dispute Resolution ("ODR"), claiming that the award of a single-source contract violated the FAA's new Acquisition Management System ("AMS"), was not in the best interests of the FAA, and was not supported by a rational basis. The AMS, which took effect on April 1, 1996, is a new regulatory procurement system for the FAA. Although the AMS evidences a strong preference for competitive procurements, it allows single-source contracts in certain circumstances.

The ODR selected an administrative law judge ("ALJ") to serve as a special master and to make a recommendation to the FAA administrator. The ALJ held that the FAA's award of a single-source contract to Hughes did not violate the AMS, and was not arbitrary, capricious, or an abuse of discretion. Based on this recommendation, the FAA denied Wilcox's protest, and Wilcox now petitions for review of that order. It is important to note that Wilcox did not protest, nor did the ALJ consider, the merits of the FAA's decision to terminate Wilcox's contract.

## II.

The phrase "cases and controversies" in Article III of the United States Constitution requires that, in order to have standing to pursue a lawsuit in federal court, a plaintiff must demonstrate that he has suffered a judicially cognizable and redressable injury. The standing requirement in federal courts has, moreover, both constitutional and prudential dimensions. See Bennett v. Spear, 117 S. Ct. 1154, 1161 (1997), and Oehrleins v. Hennepin County, --- F.3d ---, 1997 WL 304451 at *3 (8th Cir. June 9, 1997). A plaintiff must, as an "irreducible constitutional minimum," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), demonstrate three things: That he or she has suffered an injury in fact that is concrete and particularized, actual or imminent, and not merely conjectural or hypothetical; that a causal connection exists between the injury and the challenged conduct; and that a decision favorable to the plaintiff will likely redress the injury. See id. at 560-61 and Oehrleins, --- F.3d at ---, 1997 WL 304451 at *3. Once a plaintiff has done this, he or she must also satisfy certain judicially

imposed, prudential requirements, for example, that a plaintiff seeking to enforce a statute be within the zone of interests that the statute protects. See Bennett, 117 S. Ct. at 1161. Although Congress may modify these prudential requirements (for example, by expanding the zone of interests of a statute to allow any aggrieved citizen to sue), Congress may not, of course, change or undermine Article III. See id. and Lujan, 504 U.S. at 576-78. Congress, for instance, may not grant standing to an individual who has not suffered an injury in fact. See, e.g., Lujan, 504 U.S. at 576-78.

Our first task, therefore, is to determine whether Wilcox has suffered an injury in fact that satisfies the requirements of Article III. Wilcox attempts to cast the FAA's decision to deny its protest as such an injury, and, at first glance, it might indeed appear that losing a protest would indeed constitute an injury in fact. This proposed characterization, however, proves too much, for it would transform practically every dispute with an agency into one that is reviewable in a federal court. The real substance of Wilcox's complaint, both before us and before the FAA, is that the FAA violated the AMS in awarding a single-source contract to Hughes. It is this action, not the FAA's decision to deny Wilcox's protest, that must have caused Wilcox an injury in fact in order for Wilcox to have Article III standing.

In reaching this conclusion, we are, in essence, deciding that we may review on appeal only those agency adjudications in which the parties to the agency proceeding would have had standing to bring an action in federal district court with respect to the matter in dispute if one lay there. Were we to hold otherwise, and deem any loss in an agency protest proceeding an injury of Article III dimensions, we would enable plaintiffs lacking Article III standing at the outset of their protests to bootstrap their way into a federal court. Agencies, of course, are not Article III creatures, and Congress can confer standing to participate in agency proceedings on anyone it wishes. See City of St. Louis v. Department of Transp., 936 F.2d 1528, 1532 (8th Cir. 1991). In certain instances, therefore, parties who lack Article III standing with respect to a certain dispute will have standing to litigate that dispute in an agency adjudication. To

allow the losers in such disputes to appeal to the federal courts, asserting that loss as their injury in fact, would be to grant such parties Article III standing merely because Congress granted them standing to appear in the agency adjudication. Such a result would, in essence, improperly allow Congress to modify the constitutional requirements of standing. See, e.g., Lujan, 504 U.S. at 576-78.

This conclusion is neither as novel nor as restrictive as it sounds. We first note that, in the vast majority of cases, a plaintiff who has lost a protest in an agency proceeding will also have suffered an injury in fact. Plaintiffs who challenge in an agency adjudication a regulation that applies directly to them, for example, will suffer the requisite injury simply because their activities are being limited. Our conclusion today therefore applies only to those relatively rare cases in which Congress confers standing, for agency proceedings, upon a plaintiff who does not meet the requirements of Article III. This conclusion, moreover, merely comports with common sense: Irrespective of the authority of agencies to adjudicate disputes, when such disputes reach a federal court we must independently satisfy ourselves that the "case or controversy" requirement of Article III is satisfied. See City of St. Louis, 936 F.2d at 1532.

III.

The specific question that we must answer, therefore, is whether Wilcox would have had standing to challenge the FAA's award of a single-source contract to Hughes before a federal court if such an action were otherwise proper there. Although our court has not yet specifically addressed the question of what circumstances give disappointed or prospective bidders standing to challenge the procedural validity of a federal agency's award of a contract, we are not without guidance from the decisions of other courts that have had occasion to consider the matter. In particular, we believe that Scanwell Lab., Inc., v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and its progeny provide the appropriate analytical framework for addressing the case before us.

Scanwell held that a disappointed bidder, that is, a bidder who competed for and failed to receive a government contract, has standing to challenge the allegedly illegal manner in which a federal agency has awarded a contract to another firm. This is so not because the disappointed bidder would necessarily have a right to have the contract awarded to it in case the award is deemed illegal, but because the bidder has a right to have "agencies follow the regulations which control government contracting." Id. at 864. Subsequent cases have both expanded the Scanwell doctrine to include prospective bidders, that is, bidders who were altogether shut out of the award process by the agency, see, e.g., Rapides Reg'l Med. Ctr. v. Secretary, 974 F.2d 565, 570 (5th Cir. 1992), cert. denied, 508 U.S. 939 (1993), and contracted it by requiring both disappointed and prospective bidders to demonstrate that, had their bids been fairly and honestly considered, they were within the "zone of active consideration," Energy Transp. Group, Inc. v. Maritime Admin., 956 F.2d 1206, 1211 (D.C. Cir. 1992), and that there was a substantial chance of receiving an award. See, e.g., Look v. United States, 113 F.3d 1129, 1132 (9th Cir. 1997); T&S Products, Inc. v. United States Postal Serv., 68 F.3d 510, 513-14 (D.C. Cir. 1995); and CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983). This requirement merely ensures that a causal link between a bidder's loss and the agency's conduct exists, for without an injury traceable to the agency's conduct, there would be no injury in fact. If the courts did not require such a showing, it is likely that "nuisance" suits not justiciable under Article III would handicap the procurement system and flood the federal courts. See Energy Transp. Group, 956 F.2d at 1211.

In this case, it seems plain to us from the record that had the FAA conducted a second open bid, Wilcox would not have had a substantial chance of obtaining the second contract. The logic is simple: The very reason that the FAA awarded a second contract was its dissatisfaction with Wilcox, which, at the time of the second award, the FAA believed was responsible for an estimated ten-month delay in the project's completion and for an estimated budget overrun of $100 million. Regardless of who was responsible for these shortcomings (Wilcox and the FAA each blame the other),

it defies logic to imagine that an FAA so dissatisfied with Wilcox's performance to the point of terminating an already existing contract with it, even unjustifiably, would award it a second contract on a very similar project. The AMS, not surprisingly, itself requires that the FAA consider past performance when screening prospective bidders. Even if Wilcox does have a claim that the problems with its performance of the first contract are the fault of the FAA (and we of course take no position on the merits of such a claim), the appropriate remedy for Wilcox would be in breach of contract. In short, Wilcox has demonstrated no injury in fact from the FAA's decision to award a single-source contract to Hughes.

## IV.

Because we hold that Wilcox's claim does not satisfy the constitutional requirements for standing, we need not reach the question of whether it satisfies the prudential requirements. We therefore dismiss Wilcox's claim.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.