**U S WEST COMMUNICATIONS, INC., Plaintiff,**

v.

**WORLDCOM TECHNOLOGIES, INC.; Oregon Public Utility Commission, and Roger Hamilton, Chairman, Ron Eachus, Commissioner, and Joan H. Smith, Commissioner, in their official capacities as Commissioners of the Oregon Public Utility Commission, Defendants.**

No. Civ. 97–857–JE.

United States District Court, D. Oregon.

Dec. 10, 1998.

Lawrence H. Reichman, Chin See Ming, Perkins Coie, Portland, OR, Sherilyn C. Peterson, Kirstin S. Dodge, Perkins Coie, Bellevue, WA, Norton Cutler, U.S. West Communications, Inc., Denver, CO, for plaintiff U.S. West Communications.

Alexia Morrison, Morton J. Posner, Swidler & Berlin Washington, D .C., Sara Siegler Miller, Portland, OR, for defendant WorldCom Technologies, Inc.

Michael T. Weirich, W. Benny Won, Assistant Attorneys General, Department of Justice Salem, OR, for defendants Oregon Public Utility Commission and Commissioners Hamilton, Eachus & Smith.

Philip D. Barz, Emily M. Sweeney, Theodore C. Hirt, Leslie V. Batchelor, U.S. Department of Justice, Civil Division, Washington, DC, Herbert C. Sundby, U.S. Attorneys Office, Portland, OR, for Amicus Curiae Federal Communications Commission.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff U S West Communications, Inc. ("US WEST") brings this action against defendants WorldCom Technologies, Inc. ("WorldCom") (formerly known as MFS Intelenet, Inc.), the Oregon Public Utility Commission ("PUC"), and PUC Commissioners Roger Hamilton, Ron Eachus, and Joan Smith ("the Commissioners"). The Federal Communications Commission ("FCC") has participated in this proceeding as *amicus curiae*.

The dispute concerns an interconnection agreement between U.S. West and WorldCom ("the Agreement"). The background facts and procedural history are set forth in the prior opinion dated January 30, 1998, which denied defendants' motions to dismiss. The parties have each moved for summary judgment.

## *SCOPE AND STANDARD OF REVIEW*

The Telecommunications Act of 1996 ("the Act"), Pub.L. No. 104–104, 110 Stat. 56, 47 U.S.C. § 153 *et seq.*, provides for federal district court review of interconnection agreements concluded pursuant to 47 U.S.C. § 252. "[A]ny party aggrieved" by a decision of a state public utilities commission concerning such an agreement "may bring an action in an appropriate Federal district court to determine whether the Agreement ... meets the requirements of the Act." 47 U.S.C. § 252(e)(6). The Act does not specify either the standard or scope of review.

■ After some initial hesitation, the parties now generally agree that the scope of this court's review is limited to the administrative record. With regard to the standard of review, it is neither desirable nor practical for this court to sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act in Oregon. Rather, this court's principal task is to determine whether the PUC properly interpreted and applied the Act, which is a question of federal law that is reviewed *de novo*. The court declines WorldCom's invitation to defer to the PUC's interpretation of federal law. Without deciding whether such deference is ever appropriate in the case of a state administrative agency, it clearly is not appropriate in this instance because it could result in 50 different interpretations of the Act as each state agency applies its own interpretation of the law.

In all other respects, review will be under the arbitrary and capricious standard.

## DISCUSSION

1. *Count I (pricing)*

### A. Unbundled Loop

The arbitrator established an interim price of $17.20 for an unbundled loop. After this action was commenced, the PUC established a new price of $16.14 in a proceeding known as "UM 844." Although the parties refer to this as the "final" price, it is the court's understanding that the $16.14 price may be subject to revision in the future if conditions warrant. Therefore, the court will use the term "UM 844 price" rather than "final price" when referring to the $16.14 rate.

#### (i) Challenge to Interim Loop Price

■ WorldCom contends that adoption of the UM 844 price has mooted U.S. West's challenge to the interim price, yet simultaneously contends that the challenge to the UM 844 price is not ripe because U.S. West still has remedies in state court. WorldCom cannot have it both ways. Either the UM 844 price has now replaced the interim price (and thus mooted that issue) or else the interim price is still in effect and the dispute is not moot. This court concludes that the dispute over the interim price is moot. In this action, U.S. West is not seeking compensation for the services (if any) that were purchased at the interim price, so the sole remaining question is the price for future services.

That will be governed by the UM 844 price (or its successors).

■ Even if the issue were not moot, this court would affirm the arbitrator's decision establishing the interim price. The PUC began studying unbundled loop prices several years before the Act was enacted. US West actively participated in those earlier proceedings, known as "UM 351." When Congress enacted the Act in 1996, it established very short timelines. The arbitrator understandably chose to rely heavily upon the extensive record and analysis that already existed, instead of starting the process anew.

Reliance on those earlier proceedings did not deny U.S. West due process of law. Contrary to the suggestion in U.S. West's brief, the PUC did not apply principles of collateral estoppel to preclude U.S. West from contesting the loop prices. Rather, the earlier proceedings were treated as evidence that could be considered in the subsequent proceeding, and which the arbitrator and the PUC ultimately found were the most reliable evidence then available. US West was free to introduce contrary evidence and to urge a different result.

The arbitrator also acted properly in declining to consider the voluminous cost studies submitted by U.S. West just two weeks before the hearing. The arbitrator reasonably concluded that he lacked sufficient time to properly analyze those studies before the applicable deadlines, and also expressed concern about the accuracy of those studies.

### (ii) Challenge to UM 844 Loop Price

The court rejects most of U.S. West's arguments concerning the UM 844 price for unbundled loops. The PUC did not err by relying upon the record established in the UM 351, UM 773, and UM 844 proceedings. Nor does the Act require the PUC to ignore its own extensive expertise and experience in overseeing telephone pricing and service in Oregon, and in particular its knowledge of pricing, costs, and related issues as they concern U.S. West.

The parties also dispute the interpretation and application of a stipulation between U.S. West and the PUC. In ¶ 17 of the stipulation, the PUC and U.S. West agreed that in addition to the methodology prescribed in ¶ 16 of the stipulation U.S. West would also submit a study based on the methodology outlined in ¶ 17. The PUC could then compare the results obtained from these two methodologies and decide whether it wished to use the latter method in the future. However, there was no binding commitment by the PUC to use the ¶ 17 methodology in the current round of loop pricing.

■ A more difficult issue is the number of pairs per drop to be used in calculating loop prices. US West contends that most existing homes employ a two-pair design, though new construction often utilizes a three or even four-pair design. The number of pairs per drop materially impacts the loop price in two respects. First, the total loop investment (i.e., the dividend of the equation) is higher if the scorched node analysis assumes installation of three pairs per drop instead of two. Second, the divisor in the equation is the number of working loops, which is determined by multiplying the total number of loops times the average fill factor (which measures the percentage of lines or other facilities actually being used, as opposed to the theoretical capacity). US West contends that by assuming three pairs per drop instead of two (i.e., the design that will be used for future construction), but using the existing fill factors which are based on two pairs per drop, the PUC has overstated the number of working loops and thereby understated the total loop investment per working loop. That, in turn, diminishes the price U.S. West receives for the use of its loops.

The PUC insists that U.S. West is bound by the stipulation, and urges this court to resolve the dispute pursuant to Oregon contract law. However, ¶ 16 of the stipulation never mentions the number of pairs per drop, nor is that topic specifically discussed elsewhere in the stipulation. The court also reviewed the relevant portions of the record, but found little evidence that this issue was ever discussed or that any agreement was reached. Rather, the discussions about ¶ 16 focused on whether spare capacity should be treated as a volume-sensitive cost, and

whether to use the average or the objective feeder fill factor.

It is possible that the number of pairs per drop was understood by all parties or implied by other paragraphs in the stipulation, but the court has seen no clear evidence of that. Nor is it possible for this court to defer to the PUC's expertise unless the agency actually exercised that expertise. The record demonstrates that with respect to this issue, both in its own proceedings and before this court, the PUC relied almost entirely upon its contention that U.S. West was bound by the stipulation as a matter of contract law. As a result, the agency did not address—at least on the record—seemingly fundamental questions such as whether it is appropriate to apply existing fill factors (which are based on historic drop designs) to the new three-pair drop design, or whether the resulting loop price provides U.S. West "just and reasonable" compensation for the use of its loops as required by the Act.

Rather than conducting a lengthy trial, at which the parties no doubt would present conflicting testimony regarding the negotiations that led to this stipulation as well as industry conventions, the court will remand this matter to the PUC for reconsideration with instructions to resolve these issues by applying its expertise and the principles delineated in the Act, instead of relying upon the stipulation as a binding contract. As part of that reconsideration process, the PUC may reopen the record to accept additional evidence on this issue.

### B. Resale Discount

■ The arbitrator did not err by using, on an interim basis, the FCC proxy price for resale discounts. As a result of the decision in *Iowa Util. Bd. v. Federal Communications Comm'n*, 120 F.3d 753, 813 (8th Cir. 1997), *cert. granted,* —— U.S. ——, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998), the FCC proxy prices are not binding upon the states. Nevertheless, those prices still retain whatever persuasive force the individual state public

utility commissions ascribe to them. A principal reason for developing those proxy prices in the first place was the recognition that individual state public utility commissions might be unable to develop their own prices in time to meet the statutory deadlines. Incumbent local exchange carriers ("ILECs"), such as U.S. West, knew the FCC might be issuing proxy prices and had an opportunity to participate in that rulemaking process. *See* Notice of Proposed Rulemaking, 61 Fed.Reg. 18311 (April 25, 1996). US West also had an opportunity to persuade the arbitrator and the PUC not to use the proxy prices or to set a different price. There was no due process violation.

■ US West also argues that the proxy prices are based upon industry averages, without regard to the specific circumstances of U.S. West's operations in Oregon and whether U.S. West will actually avoid those costs. Even if that is true, it does not justify setting the decision aside. The arbitrator emphasized that this was merely an interim rate until more accurate cost savings data becomes available and is analyzed. US West's concerns can be addressed at that time.[1]

■ US West's attempt to draw a distinction between costs that are reasonably avoidable, versus costs that are actually avoided, is unpersuasive. The latter would require the Competitive Local Exchange Carriers ("CLECs") and the PUC to micro-manage U.S. West's operations to ensure that U.S. West actually availed itself of all reasonable opportunities for savings. To the extent U.S. West contends that certain costs are in fact not avoidable, it is merely disputing the PUC's (or the FCC's) determination of what costs are "reasonably avoidable."

■ There also is no merit to U.S. West's objection to discounting services that are already subject to volume or term discounts. The Act does not exempt such services, *per se,* from the obligation imposed by 47 U.S.C. § 252(d)(3) to make such services available at

---

1. US West complains that the PUC has failed to establish a schedule for reviewing that cost data. That dispute is not presently before this court. However, to the extent that this court's ratification of the PUC's decision is premised upon assurances that the PUC will take certain actions at a future date, the court expects the PUC to honor that commitment.

a wholesale rate that is based upon the retail price less costs that U.S. West will reasonably avoid. Of course, the wholesale discount for services that already are subject to volume or term discounts ordinarily will be less than the standard wholesale discount, since in all likelihood the existing volume or term discount already takes into account some of the cost savings that could reasonably be achieved from selling the product at wholesale (*e.g.*, billing, marketing). While there may be room for some additional savings, it is unlikely to be the full wholesale discount rate.

For purposes of this Agreement, the wholesale discount for these already discounted services was tentatively set at one-half the usual wholesale discount. Although U.S. West disagrees with the PUC's estimate of the additional cost savings that can still be achieved on top of the original discount, that is a factual question which implicates the PUC's expertise. Obviously, the number selected by the PUC is not exact. The PUC may use that number for now, but it must diligently proceed with any studies or hearings needed to establish more accurate figures.

■ Finally, U.S. West protests the PUC's determination that residential services are subject to the wholesale discount. US West contends residential service is already priced below cost. However, the Act does not exempt residential services from the wholesale discount requirement. *See* 47 U.S.C. § 252(d)(3). To the extent a particular service is already priced at or below cost, it is possible that U.S. West will not recoup its entire cost, but that would be true without regard to the wholesale discount. By definition, the wholesale discount is based upon the costs that U.S. West could reasonably avoid by selling the service at wholesale. If no costs can be avoided, then there will be no discount. Consequently, U.S. West's net profit or loss on the service should be the same notwithstanding the wholesale discount. If U.S. West fails to recoup its costs, it is because the discount rate is excessive (which is addressed above) or because the price for the service was set too low in the first place. The latter issue does not directly concern the

Act or the interconnection Agreement, but must be separately addressed in an appropriate PUC proceeding. For the same reason, there is no taking, since U.S. West's net profit or loss on the particular service should be the same as before the wholesale discount.

## C. Reciprocal Compensation to Internet Service Providers

■ US West contends it should not have to pay WorldCom compensation for calls made to WorldCom customers who are Internet service providers ("ISPs"), *i.e.*, Internet traffic. US West argues that these calls are not "telecommunications" traffic for purposes of the reciprocal compensation provisions in 47 U.S.C. § 251(b)(5). US West also argues that Internet traffic by its nature is very different from the manner in which telephone services historically have been used, and the application of traditional pricing rules may lead to unjust results and distort the marketplace by unduly subsidizing certain activities. US West contends that it will have to pay several hundred dollars a month in reciprocal compensation fees attributable to some Internet users who stay on line seven days a week, 24–hours a day, yet by law it is prohibited from charging those users more than the basic monthly rate of $12.80 for residential service (plus the $3.50 fee).

While there may be some logic to U.S. West's argument, it is Congress and the FCC—not this court—that establish federal policy on this topic. Historically, both have promoted the growth of the Internet and opposed efforts to force Internet users and ISPs to pay what critics contend is a fairer share of the costs of Internet service. In recent months, the FCC has hinted at a possible shift in policy that would affect reciprocal compensation for calls made to ISPs, *see, e.g.*, FCC Order No. 98–292 (October 30, 1998), p. 1–2, but to date that has not occurred.

The question before this court is whether the reciprocal compensation provisions in the Agreement violate the Act or a binding FCC regulation. They do not. US West may ask the PUC to revisit this issue if the FCC alters its policy.

### 2. Count II (recombining elements)

■ US West seeks to clarify the Agreement to make clear that U.S. West has no obligation to recombine unbundled elements for WorldCom. US West's principal concern is that, if forced to recombine these elements, it would be providing a finished service at a price far below even the discounted wholesale price for finished services. This would be contrary to the dichotomy (between resale and unbundled elements) that Congress established in 47 U.S.C. § 251(c)(3) and (c)(4), and create a substantial incentive for arbitrage. See Iowa Utilities, 120 F.3d at 813. From U.S. West's perspective, by analogy, WorldCom can either order a complete car (and get a wholesale discount from the retail price) or else order the parts (at the unbundled rate) and assemble the product themselves, but WorldCom cannot insist that U.S. West recombine the parts so that WorldCom receives a finished car for the price of the unassembled parts.

The arbitrator's decision acknowledged this concern, but concluded that the "Act contains no provisions allowing restrictions on the use of unbundled elements." Arbitrator's Decision (ARB 1), p. 8. The arbitrator explained that the "FCC rules appear to allow a carrier to purchase unbundled elements at unbundled element prices, and have USWC bundle them back again to the finished service. The effect of the process is to develop another price for resale." Id. at p. 7.

■ This issue is properly before the court. US West did not waive its objections by agreeing to terms mandated by a then-binding FCC order that was later overturned. During the arbitration, U.S. West vigorously protested the practice of "sham unbundling" and asked that language be inserted in the agreement to prohibit such practice. See, e.g., U.S. West's Supplemental Response in Light of FCC Interconnection Orders (R 12) at 5–7, 15–16. The arbitrator rejected U.S. West's request because he believed that he had no choice in light of the

FCC's order. US West has properly sought review of that decision by this court.

Because the arbitration decision predated the Eighth Circuit's decision in Iowa Utilities, this particular interconnection Agreement has never been reviewed to ensure compliance with the principles articulated by the Eighth Circuit. The PUC recently reconsidered its position on rebundling in light of Iowa Utilities, and issued PUC Order 98–467 (Nov. 13, 1998), which provides in relevant part that:

> MCImetro and GTE shall remove all provisions in [their] interconnection agreement that require GTE to combine network elements on behalf of MCImetro or which prohibit GTE from separating network elements that GTE currently combines. If the United States Supreme Court issues a decision in Iowa Utilities Board that is inconsistent with this conclusion, the parties may petition to revise the agreement.

Id., p. 3.

While that order is not binding in the instant case, the PUC likely would reach the same conclusion here.[2] Accordingly, the court remands this issue to the PUC for reconsideration and for such further proceedings as it deems appropriate.

### 3. Count IV[3] (interim number portability)

■ The arbitrator decided that the parties should pay their own costs for implementing interim number portability, and declined to require that WorldCom compensate U.S. West for calls ported to WorldCom customers.

The Act authorizes the FCC to determine how the costs of interim number portability are to be divided "on a competitively neutral basis." 47 U.S.C. § 251(e)(2). The method selected by the arbitrator is among several approved by the FCC. See FCC Order 96–286 ("First Report and Order") (July 2,

---

**2.** In addition, there are a myriad of technical and pricing issues relating to recombining (or prohibitions upon separating) elements that implicate the PUC's expertise. The present agreement does not adequately address those issues.

**3.** The court previously dismissed Count III.

1996), ¶¶ 130 through 136. Of course, the mere fact that a given method is among those approved by the FCC does not necessarily mean that it is appropriate for the particular situation at hand. The arbitrator must still exercise discretion in selecting a suitable method, and U.S. West can challenge that decision as it has done here. However, the court is satisfied that there was a reasonable basis for the arbitrator's decision to select this method. Furthermore, this is only an interim method until a permanent number portability system is implemented.

The court rejects U.S. West's contention that the PUC acted contrary to the methodology prescribed in its Order No. 96–021 (Jan. 12, 1996). That PUC order predates passage of the Act and issuance of the FCC rules implementing the Act. The PUC had both the discretion, and the obligation, to modify its position in light of those subsequent developments.

### 4. *Count V (due process)*

US West's due process claim primarily alleges that there was insufficient evidence in the record to support the challenged decisions. To the extent that this court has affirmed those decisions, the claim necessarily fails.

### 5. *Count VI (taking)*

US West's taking claim does not seek compensation for a completed taking, but rather alleges that a taking will result if the PUC's decision is affirmed and U.S. West receives less compensation for services than the amount to which it allegedly is entitled. US West also urges this court to construe the Act so as to avoid a taking.

 The court rejects defendants' contention that this claim must be dismissed because U.S. West has not exhausted state compensation remedies. It is doubtful that the state courts would have jurisdiction over such a claim, since the federal courts have exclusive jurisdiction over challenges to the interconnection agreements arising from the Act. 47 U.S.C. § 252(e)(4) and (e)(6). The takings claim is essentially the flip side of a challenge to the terms of the interconnection agreement (or a challenge to the Act itself).

 Nevertheless, the taking claim fails because no taking has yet occurred. No evidence has been presented to this court to show that WorldCom has purchased any services pursuant to this Agreement, nor is there any assurance that it ever will. Even if WorldCom does purchase services, the details of those purchases are as yet undetermined. For instance, it is not clear whether WorldCom will purchase finished services or unbundled elements, or whether it will purchase services for residential or business use. In addition, a number of the prices and terms are clearly denominated as interim and subject to revision by the PUC once additional information is obtained.

Finally, since the Act mandates that U.S. West receive just and reasonable compensation, a determination by this court that the Agreement complies with the Act (or setting aside a provision that does not comply with the Act) is fatal to any claim that U.S. West's property has been taken without just compensation.

### *ORDER*

WorldCom's Motion to Strike (docket # 110–1) is DENIED. The cross-motions for summary judgment by U.S. West (docket # 63–1), the PUC and the Commissioners (docket # 116–1), and WorldCom (docket # 112–1), are each GRANTED IN PART AND DENIED IN PART. Summary judgment is GRANTED FOR DEFENDANTS on part of Count I (interim loop price, resale discounts, and reciprocal compensation for calls to Internet providers), Count IV (compensation for interim number portability), Count V (due process), and Count VI (taking). That portion of Count I concerning the "final" (or UM 844) loop price, and Count II (recombining unbundled elements), are REMANDED to the PUC for reconsideration and further proceedings as it deems appropriate.

IT IS SO ORDERED.