**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 14 2001**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

QWEST COMMUNICATIONS
INTERNATIONAL, INC., fka U.S.
WEST COMMUNICATIONS, INC.,

      Petitioner,

vs.

FEDERAL COMMUNICATIONS
COMMISSION,

      Respondent.

-------------------------

BELLSOUTH CORPORATION;
BELLSOUTH
TELECOMMUNICATIONS, INC.;
AT&T; NATIONAL TELEPHONE
COOPERATIVE ASSOCIATION,
(NTCA); SPRINT CORPORATION;
TELECOMMUNICATIONS
RESELLERS ASSOCIATION (TRA);
MCI WORLDCOM, (MCI) formerly
known as MCI Telecommunications
Corporation; GTE SERVICE
CORPORATION (GTE); NEXTLINK
COMMUNICATIONS, INC.
(NEXTLINK); AIRTOUCH
COMMUNICATIONS, INC.
(AIRTOUCH); CINCINNATI BELL
TELEPHONE COMPANY (CBT);
TIME WARNER
COMMUNICATIONS HOLDINGS,
INC. ("TWCOMM"); THE
ASSOCIATION FOR LOCAL

No. 97-9518

TELECOMMUNICATION SERVICES ("ALTS"); NATIONAL CABLE TELEVISION ASSOCIATION, INC.; WORLDCOM, INC.; BELL ATLANTIC-DELAWARE, INC., BELL ATLANTIC-MARYLAND, INC., BELL ATLANTIC-NEW JERSEY, INC., BELL ATLANTIC-PENNSYLVANIA, INC., BELL ATLANTIC-VIRGINIA, INC., BELL ATLANTIC-WASHINGTON, D.C., INC., BELL ATLANTIC-WEST VIRGINIA, INC., "Bell Atlantic"; UNITED STATES TELEPHONE ASSOCIATION ("USTA"),

Intervenors.

---

PETITION FOR REVIEW OF ORDERS
OF THE FEDERAL COMMUNICATIONS COMMISSION
(FCC Docket No. 95-116)

---

Samir C. Jain (William T. Lake, John H. Harwood II, Lynn R. Charytan, Wilmer, Cutler & Pickering, Washington, D.C., and Dan L. Poole and Robert B. McKenna, U.S. West Communications, Inc., Washington, D.C., with him on the briefs), for Petitioner.

Stewart Allen Block (Christopher J. Wright, General Counsel, John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, Washington, D.C. and Joel I. Klein, Assistant Attorney General, Catherine G. O'Sullivan, Nancy C. Garrison, United States Department of Justice, Washington, D.C., with him on the brief), for Respondent.

James H. Bolin, Jr. (Mark C. Rosenblum, Roy E. Hoffinger, AT&T Corp., Basking Ridge, New Jersey, and Peter D. Keisler, Daniel Meron, Rudolph M. Kammerer, Sidley & Austin, Washington, D.C., with him on the briefs) for

Intervenor AT&T Corp.

Thomas F. O'Neil, III, William Single, IV, Matthew B. Pachman, MCI WORLDCOM, INC., Washington, D.C. and Donald B. Verrilli, Jr. Jodie L. Kelley, Heather K. Gerken, Jenner & Block, Washington, D.C., for Intervenor MCI WorldCom, Inc.

_____

Before **EBEL**, **BALDOCK** and **KELLY**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Petitioner Qwest Communications International Inc. ("Qwest") seeks our review of two orders of the Federal Communications Commission (the "Commission") pertaining to number portability: Telephone Number Portability, First Report and Order and Further Notice of Proposed Rulemaking, CC Docket No. 95-116, FCC 96-286 (July 2, 1996) ("First Report and Order"); and Telephone Number Portability, Fourth Memorandum Opinion and Order on Reconsideration, CC Docket No. 95-116, FCC 99-151 (July 16, 1999) ("Fourth Reconsideration Order"). [1] Our jurisdiction arises under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1). We dismiss Qwest's petition for lack of standing as it relates to those metropolitan statistical areas ("MSAs") where it has deployed long-term number portability. Further, we dismiss Qwest's petition for lack of ripeness as it relates to all other MSAs in which Qwest operates but has not yet

_____

[1] We refer to these orders collectively as the "Orders."

provided long-term number portability.

Background

The Telecommunications Act of 1996 (the "Act") [2] "fundamentally restructure[d] local telephone markets. States may no longer enforce laws that impede competition, and incumbent LECs are subject to a host of duties intended to facilitate market entry." AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 371 (1999). One such duty "is the LEC's obligation . . . to share its network with competitors." Id. A competitor can access an LEC's network by (1) purchasing the LEC's services at wholesale rates; (2) leasing particular elements of the LEC's network, such as the local loop, switch, or transport trunk; [3] or (3) "interconnect[ing] its own facilities with the incumbent's network." Id. Another duty imposed upon LECs is that of providing number portability. LECs are required to provide "to the extent technically feasible, number portability in accordance with requirements prescribed by the Commission." 47 U.S.C. § 251(b)(2).

Number portability is "the ability of users of telecommunications services

---

[2] See the historical and statutory notes to 47 U.S.C. § 609 for a list of the sections enacted by the Act and those sections amended by the Act.

[3] Local loops "connect[] telephones to switches." AT&T, 525 U.S. at 371. Switches "direct[] calls to their destinations" via transport trunks. Id. Transport trunks are the wires that "carry[] calls between switches." Id.

to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." Id. § 153(30). Number portability "is essential to meaningful competition in the provision of local exchange services." First Report and Order ¶ 28. However, as the Commission observes in its brief, "[t]he need to port numbers does not arise in all forms of competitive entry. If a new entrant does not operate its own separate local exchange switch (for example, if a new entrant merely 'resells' the telephone services of an incumbent), a customer can change providers without changing its phone number." Resp. Br. at 5. Thus, an LEC is required to port numbers only when a customer switches service to a new telecommunications service provider that operates its own switch.

In accordance with § 251(b)(2), the Commission required "[a]ll LECs [to] provide a long-term database method for number portability in the 100 largest . . . MSAs by December 31, 1998, in accordance with the deployment schedule . . . , in switches for which another carrier has made a specific request for the provision of number portability." 47 C.F.R. § 52.23(b)(1); accord First Report and Order ¶ 77. After December 31, 1998, LECs are required to deploy number portability in switches in the 100 largest MSAs for which no request was previously made and in all other MSAs (which we refer to as "smaller MSAs")

upon request. [4] 47 C.F.R. §§ 52.23(b)(2)(iv), 52.23(c); accord First Report and Order ¶ 80; First Reconsideration Order ¶ 107. Until the deployment of long-term number portability, "[a]ll LECs shall provide transitional number portability measures . . . as soon as reasonably possible upon receipt of a specific request from another telecommunications carrier . . . ." [5] 47 C.F.R. § 52.27(a); accord First Report and Order ¶¶ 110-14.

The Act also requires that "[t]he cost of . . . number portability . . . be borne by all telecommunications carriers on a competitively neutral basis as determined by the Commission." 47 U.S.C. § 251(e)(2). The Commission did not actually make such a determination. Rather, the Commission first defined the phrase "competitively neutral," to mean that "the cost of number portability borne by each carrier [should] not affect significantly any carrier's ability to compete with other carriers for customers in the marketplace." First Report and Order ¶ 131. The Commission then set forth two criteria that a state's cost recovery mechanisms must satisfy to ensure competitively neutral cost allocation. First, the mechanism must "not . . . [g]ive one telecommunications carrier an

---

[4] LECs must deploy long-term number portability in additional switches in the 100 largest MSAs within 30 to 180 days of the request, depending upon the current capabilities of the switch. 47 C.F.R. § 52.23(b)(2)(iv)(A-D). In the smaller MSAs, LECs must deploy long-term number portability within six months of a request. Id. § 52.23(c).

[5] We refer to "transitional number portability" as "interim number portability," the term used by the Commission in the Orders.

- 6 -

appreciable, incremental cost advantage over another telecommunications carrier, when competing for a specific subscriber." 47 C.F.R. § 52.29(a); accord First Report and Order ¶ 132. Second, the mechanism must not "[h]ave a disparate effect on the ability of competing telecommunications carriers to earn a normal return on their investment." 47 C.F.R. § 52.29(b); accord First Report and Order ¶ 135. "In setting forth these criteria, however, [the Commission] left to the states the determination of the exact cost recovery mechanism to be utilized." Fourth Reconsideration Order ¶ 32; accord 47 C.F.R. § 52.29.

The Commission did, however, articulate four cost recovery mechanisms that, if adopted by a state regulatory body, would ensure competitively neutral allocation of interim number portability costs. Three of these mechanisms, some of which various states had already adopted, allocated costs according to each carrier's market share as determined by the carrier's number of ported numbers, telephone numbers (or lines), or gross revenue. First Report and Order ¶ 136. The fourth mechanism, and the one with which Qwest particularly takes issue, "require[d] each carrier to pay for its own costs of currently available number portability measures . . . ." Id.; accord Fourth Report and Order ¶¶ 48-49.

In its petition for review of the Orders, Qwest argues that the Commission's failure to create a federal recovery mechanism for costs associated with the provision of interim number portability (1) violated 47 U.S.C. §

251(e)(2), and (2) constituted an unconstitutional taking by the federal government. Because Qwest lacks standing to challenge the Orders as they pertain to MSAs in which Qwest has deployed long-term number portability, and because Qwest's petition is not ripe as it pertains to MSAs in which Qwest has not deployed long-term portability, we do not reach the merits of Qwest's petition.

## Discussion

### MSAs in Which Qwest Has Deployed Long-term Number Portability: Standing

Although subsequent to briefing the Commission has withdrawn its argument that Qwest lacks standing to bring its petition, we consider the issue sua sponte in examining our own jurisdiction. Skrzypczak v. Kauger, 92 F.3d 1050, 1052 (10th Cir. 1996) ("We are obliged to address standing sua sponte because it involves a constitutional limitation on a federal court's jurisdiction, and federal courts are under an independent obligation to examine their own jurisdiction." (internal quotations and citations omitted)). To establish standing under Article III of the Constitution, a plaintiff "must demonstrate [among other things] an injury in fact - -a harm that is both concrete and actual or imminent, not conjectural or hypothetical." Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 1858, 1861 (2000) (internal quotations and

citation omitted).    "The party invoking federal jurisdiction bears the burden of establishing th[is] element[]."    Lujan v. Defenders of Wildlife   , 504 U.S. 555, 561 (1992).   Standing must exist throughout the litigation.       In re Yellow Cab Co-op Ass'n , 132 F.3d 591, 594 (10th Cir. 1997).

Qwest has not established that it has suffered injury in fact in any of the MSAs in which it has deployed long-term number portability because Qwest has failed to demonstrate that a state required Qwest to port     any telephone numbers in those MSAs.  In fact, some seven months after long-term number portability mechanisms were to be deployed in the 100 largest MSAs in which a request for number portability had been made, the Commission found that "petitioners [including Qwest]. . . have not shown the actual impact of the guidelines based on state orders" and that there was no "rate order under which the impact of the cost recovery guidelines [could] be evaluated . . . ."  Fourth Report and Order ¶ 63; accord  Pet. Br. at 13 (including Qwest within the class of petitioners that asserted the takings claim before the Commission).  One district court has upheld the Oregon Public Utility Commission's decision to require Qwest to bear its own costs in Oregon, but that court also noted that there was "[n]o evidence . . . presented . . . to show that WorldCom has purchased any services pursuant to this Agreement, nor is there any assurance that it ever will."       US West Communications, Inc. v. WorldCom Technologies, Inc.      , 31 F. Supp. 2d 819, 826-

27 (D. Ore. 1998) (hereinafter US West). Absent any evidence that Qwest was required to port telephone numbers in MSAs in which it has deployed long-term number portability, we decline to consider whether the Orders as they pertain to the provision of interim number portability in those MSAs violate § 251(e)(2) or effect an unconstitutional taking.

Qwest relies heavily upon the Supreme Court's decision in Clinton v. City of New York, 524 U.S. 417 (1998), to argue that Qwest "suffered actual injury sufficient to confer standing—and certainly a sufficient likelihood of economic injury." Pet. Reply. Br. at 2-3 (quotations and citation omitted). Qwest's reliance upon Clinton is misplaced, however, because Clinton is factually distinguishable.

Clinton stands for the proposition that a party has standing to challenge the legality of a government action (in Clinton, a presidential line item veto) where that action revives "a substantial contingent liability [which] immediately and directly affects the borrowing power, financial strength, and fiscal planning of the potential obligor" (in Clinton, a tax liability in excess of two billion dollars). 524 U.S. at 430-31. Contrary to Qwest's contention, to the extent the Orders pertain to MSAs in which Qwest has deployed long-term number portability, the Orders did not "cause[] actual injury to [Qwest] in the same way that the presidential veto in Clinton injured New York." Pet. Reply. Br. at 4. Qwest's

alleged injury differs from those of the plaintiffs' in Clinton in one critical respect: while the First Report and Order may have imposed upon Qwest a contingent liability when the Commission issued the order in 1996, any such liability cannot be contingent today. That is, at least with respect to those MSAs in which Qwest has deployed long-term number portability, the injury in fact necessary to confer standing upon Qwest to challenge the Orders as they relate to interim number portability in those MSAs must have already occurred.

Thus, unlike the Clinton Court, we are the beneficiaries of hindsight. We need not speculate as to how the Orders might affect Qwest, but instead can determine how the Orders in fact affected Qwest. Clinton, therefore, provides no basis upon which Qwest can establish standing to challenge the Orders as they relate to Qwest's provision of interim number portability in the MSAs in which it has deployed long-term number portability.

Contrary to Qwest's contention, we do not believe that Qwest has standing to challenge the Commission's orders "simply by virtue of being 'a member of the regulated class.'" Pet. Reply Br. at 5 (quoting Cronin v. F.A.A., 73 F.3d 1126, 1130 (D.C. Cir. 1996)). The two cases upon which Qwest relies, Cronin and Pennell v. City of San Jose, 485 U.S. 1 (1988), are factually inapposite. In Cronin, the court held that a pilot and labor organization representing pilots had standing to challenge alcohol testing regulations. The labor organization had

standing because "the likelihood that the alcohol testing regulations will be enforced against [its] members provides sufficient threat of injury to confer . . . standing . . . ." Cronin, 73 F.3d at 1130. The pilot had standing because he "belong[ed] to a specific class made subject to [the] challenged testing regulation." Id. In Pennell, the Supreme Court held that a landlord and organization representing most of the landlords in the city had standing to challenge a city rent control ordinance. The plaintiffs had standing because of the "likelihood of enforcement, with the concomitant probability that a landlord's rent will be reduced below what he or she would otherwise be able to obtain in the absence of the [o]rdinance . . . ." 485 U.S. at 8. Thus, both Cronin and Pennell address the question of standing in terms of prospective injury. As explained, any injury Qwest suffered as a result of the Orders as they pertain to MSAs in which Qwest has deployed long-term number portability must have already occurred. Thus, the "threat of actual injury" has necessarily passed. Pennell, 485 U.S. at 8. Moreover, to hold that any member of a regulated class automatically has standing to challenge a regulation regardless of injury, would, in some cases, eviscerate the constitutional standing requirement of injury in fact.

We are mindful of the procedural posture of Qwest's appeal: "Because Article III's standing requirement does not apply to agency proceedings, [Qwest] had no reason to include facts sufficient to establish standing as a part of the

- 12 -

administrative record." Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.,
117 F.3d 1520, 1527-28 (9th Cir. 1997); see also Envirocare of Utah, Inc. v.
Nuclear Regulatory Comm'n, 194 F.3d 72, 74 (D.C. Cir. 1999); Wilcox Elec.,
Inc. v. F.A.A., 119 F.3d 724, 727 (8th Cir. 1997). This does not, however,
change the fact that Qwest's petition is subject to the case or controversy
requirement of Article III. Qwest has the burden of establishing the existence of
a case or controversy in its petition. The Supreme Court's admonition in Pennell
addressed this situation:

> We strongly suggest that in future cases parties litigating in this
> Court under circumstances [in which the case originated in a court
> not subject to Article III of the Constitution] take pains to
> supplement the record in any manner necessary to enable us to
> address with as much precision as possible any question of standing
> that may be raised.

485 U.S. at 8; accord Northwest Envtl. Def. Ctr., 117 F.3d at 1527-29. Perhaps
for this very reason, 28 U.S.C. § 2347(c) allows "a party to a proceeding to
review [to] appl[y] . . . for leave to adduce additional evidence [if the party]
shows . . . that— (1) the additional evidence is material; and (2) there were
reasonable grounds for failure to adduce the evidence before the agency." [6]
Accord Northwest Envtl. Def. Ctr., 117 F.3d at 1528 ("Because standing was not

---

[6] If the party makes this showing to the court's satisfaction, "the court may
order the additional evidence and any counterevidence the opposite party desires
to offer to be taken by the agency." Id.

- 13 -

at issue in earlier proceedings, we hold that petitioners in this case were entitled to establish standing anytime during the briefing phase."). Qwest has not availed itself of this opportunity to establish the constitutional requirements of standing. Qwest certainly could have obtained leave to adduce evidence regarding standing had it made such a request. The evidence regarding standing would have been material and, as explained, there were reasonable grounds for Qwest's failure to adduce evidence of injury before the Commission.

The authority upon which Qwest relies does not require a contrary conclusion. Application of the Sixth Circuit's analysis in North American Aviation v. National Transportation Safety Board to this case would require that we look only to the administrative record to determine Qwest's standing. 94 F.3d 1029, 1031 (6th Cir. 1996) (refusing to review petition of National Transportation Safety Board rulemaking because the " administrative record does not support [the court's] exercise of jurisdiction" (emphasis added)). Moreover, application of the Ninth Circuit's decision in Northwest Environmental Defense Center is consistent with our holding that Qwest must establish standing, notwithstanding the fact that the Commission's proceedings were not subject to Article III. 117 F.3d at 1528 ("We therefore consider the affidavits not in order to supplement the administrative record on the merits, but rather to determine whether petitioners can satisfy a prerequisite to this court's jurisdiction.").

Finally, this case does not present a complex causation issue, the resolution of which "would require significant time and resources, with little prospect that it would yield a definitive and reliable finding of fact."    See 3 KENNETH CULP DAVIS & RICHARD J PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 16.6 at 46 (3d ed. 1994). To establish injury in fact, Qwest need only have established that it was required to provide interim number portability on what it believed to be something other than a competitively neutral basis; this it failed to do.

Interim Number Portability in MSAs in which Qwest Has Not Yet Deployed Long-term Number Portability: Ripeness

We also decline to consider Qwest's petition as it relates to interim number portability in MSAs in which it has not yet provided long-term number portability for lack of ripeness. We decline to review administrative decisions unless they "arise in the context of a controversy 'ripe' for judicial resolution."    Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967),    overruled in part on other grounds, Califano v. Sanders, 430 U.S. 99, 104-05 (1977). The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."    Abbott Laboratories, 387 U.S. at 148-49. In making a ripeness determination, we consider "(1) whether delayed review would cause

- 15 -

hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n., Inc. v. Sierra Club, 523 U.S. 726, 732-33 (1998); Northwest Pipeline Corp. v. F.E.R.C., 986 F.2d 1330, 1333-34 (10th Cir. 1993) (considering four factors in conducting ripeness analysis).

Qwest has not shown that it has or will provide interim number portability in MSAs in which it has not yet deployed long-term number portability, including Oregon. Cf. US West, 31 F. Supp. 2d at 826-27. Therefore, because the Orders have not had a "direct and immediate" impact upon Qwest, our decision to withhold consideration will not cause hardship to Qwest. Abbott Laboratories, 387 U.S. at 152; accord Northwest Pipeline 986 F.2d at 1333-34; cf. People of the State of California v. F.C.C., 124 F.3d 934, 943-44 (8th Cir. 1997), overruled in part on other grounds AT&T Corp. v. Iowa Utilities Bd., 525 U.S. 366 (1999); compare Abbott Laboratories, 387 U.S. at 138-39, 152-53 (ripeness found where Commissioner of Food and Drugs promulgates regulation requiring all labels, advertisements, and printed material relating to prescription drugs "to designate the established name of the particular drug involved every time its trade name is used anywhere in such material"), with Toilet Goods Ass'n, Inc. v. Gardner, 387 U.S. 158, 161, 164-65 (1961) (ripeness not found where "regulation merely states

- 16 -

that the Commissioner may authorize inspectors to examine certain processes or formulae; no advance action is required of cosmetics manufacturers . . . [and] no irremediable adverse consequences flow from requiring a later challenge to this regulation by a manufacturer who refuses to allow this type of inspection"). In fact, the Orders will not impact Qwest, on any level, until (1) a carrier entering an MSA in which Qwest operates requests that Qwest provide interim number portability; (2) the carrier plans to operate its own switch; (3) Qwest is able to provide interim number portability before it deploys long-term number portability; and (4) the state in which the carrier requests that Qwest provide interim number portability requires Qwest to bear the cost of interim number portability on something other than what Qwest believes to be a competitively neutral basis.

By withholding consideration, we will also "benefit from further factual development of the issues presented." Ohio Forestry, 523 U.S. at 732-33. Until Qwest is actually required to bear the cost of interim number portability by a state, and until Qwest incurs those costs on what it believes to be something other than a competitively neutral basis, we cannot determine whether the Orders violate § 251(e)(2)'s requirement that such costs be borne by all telecommunication carriers on a competitively neutral basis. At such time, and after Qwest "has availed itself of the process provided by the Tucker Act,"

Preseault v. I.C.C. , 494 U.S. 1, 11 (1990); Miller v. Campbell County , 945 F.2d 348, 352 (10th Cir. 1991), Qwest's taking claim will also be ripe for review. Pennell , 485 U.S. at 10; F.P.C. v. Texaco, Inc. , 417 U.S. 380, 391-92 (1974) ("Any broadside assertion that indirect regulation will be confiscatory is premature. The consequences of indirect regulation can only be viewed in the entirety of the rate of return allowed on investment, and this effect will be unknown until the Commission has applied its scheme in individual cases over a period of time."). [7]

In sum, we decline to "entangl[e] [ourselves] in [an] abstract disagreement[] over administrative policies" because Qwest has not felt the effect of the Orders "in a concrete way." Abbott Laboratories , 387 U.S. at 148-49. Having concluded that we will benefit from further factual development of Qwest's claims, we decline to "accord heavy weight to th[e] view" that "when the Congress passed the Hobbs Act, which allows a petitioner 60 days within which to challenge an order of the FCC, it determined that the agency's interest generally lies in prompt review of agency regulations," Mountain States

---

[7] Thus, even if we were to accept Qwest's argument that "the [Commission] cannot rely on states to fulfill the [Commission's] own constitutional responsibility," and that the Orders "provid[e] no compensation at all, a result that by definition fails to provide the 'just compensation' required by the Fifth Amendment," Pet. Br. at 35, Qwest's takings claim against the Commission would nevertheless be premature.

Telephone and Telegraph Co. v. F.C.C., 939 F.2d 1035, 1040 (D.C. Cir. 1991) (internal quotations and citations omitted), because we will benefit from postponing review. Cf. Eagle-Picher Indus., Inc. v. E.P.A., 759 F.2d 905, 917 (D.C. Cir. 1985) ("Furthermore, we find that the court had no compelling interest in postponing review until the NPL was issued."); Ass'n of Am. Railroads v. I.C.C., 846 F.2d 1465, 1469 (concluding that the issue "appears" to be in a sufficiently concrete form).

Until Qwest suffers actual or imminent injury, and "[p]ending the development of . . . a [ripe] controversy, [Qwest] need not fear preclusion by reason of the 60-day stipulation in 28 U.S.C. § 2344. A time limitation on petitions for judicial review, it should be apparent, can run only against challenges ripe for review." Baltimore Gas and Elec. Co. v. I.C.C., 672 F.2d 146, 149-50 (D.C. Cir. 1982). Once Qwest is required to bear the cost of providing interim number portability on what it believes to be something other than a competitively neutral basis, Qwest "may file a request for declaratory ruling with the Commission, seeking [the Commission's] view on whether the statute and [the Commission's] rules have been properly applied." First Report and Order ¶ 139. If Qwest seeks a declaratory ruling by the Commission, and the arguments raised in this petition are rejected by the Commission, Qwest may seek our review of the Commission's ruling pursuant to 28 U.S.C. § 2344. Cf.

Baltimore Gas and Elec., 672 F.2d at 149-50. Contrary to Qwest's contention, the Ninth Circuit's interpretation of the Hobbs Act in US West Communications v. MFS Intelenet, Inc., 193 F.3d 1112, 1120 (9th Cir. 1999) (hereinafter MFS), does not create a roadblock to this avenue of review. MFS, which only binds courts in the Ninth Circuit,[8] stands only for the rule that an "FCC order is not subject to collateral attack" in an appeal from a district court decision holding that an interconnection agreement complied with the requirements of the Act. Id. at 1117, 1120 (emphasis added). MFS does not preclude "[a]n aggrieved party [from] invok[ing] this [court's] jurisdiction . . . by filing a petition for review of [an] FCC['s] final order in a court of appeals . . . ." Id. at 1120.

Qwest's petition is DISMISSED.

---

[8] While we cited MFS as supporting the Commission's definition of "competitively neutral" in RT Communications, Inc. v. Federal Communications Commission, 201 F.3d 1264, 1268-69 (10th Cir. 2000), we merely noted that the MFS court also "prohibited a collateral attack on this order since plaintiffs had not sought a determination of validity directly with the court of appeals." Id. at 1269.