193 F.3d 1112 (9th Cir. 1999)
 US WEST COMMUNICATIONS, Plaintiff-Appellant,
v.
MFS INTELENET, INC.; SHARON L. NELSON, Chairman; RICHARD HEMSTAD, Commissioner; WILLIAM P. GILLIS, Commissioner, in their official capacities as Commissioners of the Washington Utilities and Transportation Commission; and WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, (WUTC), Defendants-Appellees.
US WEST COMMUNICATIONS, Plaintiff-Appellant,
v.
TCG SEATTLE, a limited partnership; ANNE LEVINSON, Chairperson; RICHARD HEMSTAD, Commissioner; WILLIAM P. GILLIS, Commissioner, in their official capacities as Commissioners of the Washington Utilities and Transportation Commission; and WASHINGTON UTILITIES AND TRANSPORTATION COMMISSION, Defendants-Appellees.
 No. 98-35146 No. 98-35203
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted November 2, 1998--Seattle, Washington
Decided October 8, 1999
 
 [Copyrighted Material Omitted]
 Sherilyn Peterson and Kirstin S. Dodge, Perkins Coie, Bellevue, Washington, Norton Cutler, U.S. West Law Department, Denver, Colorado, for the plaintiff-appellant.
 Daniel M. Waggoner, Seattle, Washington, Shannon E. Smith, Assistant Attorney General, Olympia Washington, for the defendants-appellees.
 Joel VanOver and Douglas G. Bonner, Swidler & Berlin, Washington, D.C., for the defendant-appellee.
 Paul M. Gordon, Gordon & Goddard, Oakland, California, for the defendant-appellee.
 Susan L. Pacholski, United States Department of Justice, Washington, D.C., for the amicus.
 Appeals from the United States District Court for the Western District of Washington; William L. Dwyer, District Judge, Presiding. D.C. No. CV-97-00222-WLD, D.C. No. CV-97-00354-WLD.
 Before: James R. Browning and Michael Daly Hawkins, Circuit Judges, and Milton I. Shadur,[1] District Judge.
 BROWNING, Circuit Judge:
 
 
 1
 The Telecommunications Act of 1996 (Act) is designed to foster competition in local and long distance telephone markets. The local competition provisions of the Act require incumbent local exchange carriers (defined in 47 U.S.C. S 251(h)(1)) to allow other local exchange carriers access to the incumbent carrier's networks or services to enable them to compete in providing local telephone services: (1) incumbent carriers must interconnect their networks with new entrants "at any technically feasible point," and the interconnection must be "at least equal in quality" to the interconnection the incumbent carrier provides for itself, 47 U.S.C. S 251(c)(2); (2) incumbents must provide nondiscriminatory, unbundled access to network elements[2] in a manner that allows new entrants to combine the elements to provide telecommunications services, see 47 U.S.C. S 251(c)(3); and (3) incumbents must offer for resale, at wholesale rates, any telecommunications service an incumbent offers at retail, and permit new entrants to resell those services to end-users. See 47 U.S.C. S 251(c)(4). The Act prohibits incumbent carriers from imposing unreasonable or discriminatory conditions or limitations on the resale of the services. See id.
 
 
 2
 Incumbent carriers must negotiate in good faith agreements (commonly referred to as interconnection agreements) with competing carriers setting forth particular terms and conditions upon which incumbent carriers will satisfy their duties under the Act. See 47 U.S.C. S 251(c)(1). If the parties are unable to reach agreement through good faith negotiations, a party to the negotiation may request that the state utilities commission arbitrate unresolved issues. See 47 U.S.C. S 252(b)(1). A state commission may impose terms by arbitration only if the terms meet the substantive requirements of section 251, including regulations implementing that section, and the pricing standards of section 252. See 47 U.S.C. S 252(c). After the state commission approves an interconnection agreement, a party to the agreement may bring an action in district court "to determine whether the agreement or statement meets the requirements" of the Act. 47 U.S.C. S 252(e)(6).
 
 
 3
 The Federal Communications Commission (FCC) issued rules implementing the local competition provisions of the Act. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, 11 F.C.C.R. 15499 (Aug. 8, 1996) (Local Competition Order ). Suits challenging the rules were consolidated in the Eighth Circuit. The Eighth Circuit vacated the pricing rules on the ground that the Act authorized state utility commissions, not the FCC, to set rates. See Iowa Utilities Bd. v. FCC, 120 F.3d 753, 793-800 (8th Cir. 1997). The court expressly declined to review the pricing rules on the merits. See id. at 800. The court also vacated non-pricing rules that required incumbent carriers to combine unbundled network elements for competing carriers, and prohibited incumbent carriers from separating already combined network elements before leasing them to competing carriers.
 
 
 4
 In relevant part, the Supreme Court reversed the Eighth Circuit's ruling that the FCC did not have jurisdiction to promulgate pricing rules, holding the FCC had jurisdiction to "prescribe such rules and regulations as may be necessary in the public's interest to carry out the provisions of the Act," including the "jurisdiction to design a pricing methodology." See AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 119 S. Ct. 721, 729, 733 (1999). The Supreme Court also reinstated the rule prohibiting incumbent carriers from separating already combined network elements. See id. at 737-38.
 
 Procedural Background
 
 5
 MFS Intelenet, Inc. (MFS) and TCG Seattle (TCG), competing local exchange carriers, asked US West Communications (US West), the incumbent local exchange carrier, to negotiate an interconnection agreement. The parties were unable to resolve all issues by negotiation, and MFS and TCG requested arbitration by the Washington Utilities and Transportation Commission (Commission). The Commission appointed an arbitrator in each case, and arbitration hearings were held. Arbitrators' reports and decisions were filed and comments and objections received. The Commission concluded the agreements met the requirements of sections 251 and 252 of the Act, and approved them. US West challenged the Commission's decisions and asserted takings claims in district court. The district court held that the agreements complied with the Act and dismissed the taking claims as unripe. US West appealed.
 
 Standard of Review
 
 6
 We review the district court's grant of summary judgment de novo. See San Diego Gas & Elec. Co. v. Canadian Hunter Mktg., 132 F.3d 1303, 1306 (9th Cir. 1997). The Act confers jurisdiction upon district courts to review interconnection agreements for compliance with the Act:
 
 
 7
 In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section.
 
 
 8
 47 U.S.C. S 252(e)(6) (emphasis added). We apply the same standard the district court should apply, considering de novo[3] whether the agreements are in compliance with the Act and the implementing regulations, see Orthopaedic Hosp. v. Belshe, 103 F.3d 1491, 1495 (9th Cir. 1997) (a state agency's interpretation of a federal statute is considered de novo), and considering all other issues under an arbitrary and capricious standard. See, e.g., US West Communications, Inc. v. Hix, 986 F. Supp. 13, 19 (D. Colo. 1997) (holding that courts should apply the de novo standard to all issues involving a "determination of the [state commission's] procedural or substantive compliance `with the requirements of the [Telecommunications Act] and its implementing regulations,' " and an arbitrary and capricious standard to all other issues). We agree with the district court that the agreements complied with the Act and the FCC regulations, and that other decisions of the Commission challenged by US West were not arbitrary and capricious. Although the district court applied the wrong standard in its review of some of the issues,[4] the errors were harmless.[5]
 
 Discussion
 1. Ripeness of Challenge to Interim Rates
 
 9
 US West challenges several of the pricing provisions as inconsistent with pricingstandards fixed by the Act. Because the challenged provisions are interim only and may be adjusted by later pricing proceedings, we conclude that these prices are therefore not ripe for review.
 
 
 10
 Federal courts must refrain from premature adjudication of agency action to avoid "entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Lab. v. Gardner, 387 U.S. 136, 148 (1967). Principles of federalism lend this doctrine additional force when a federal court is reviewing a state agency decision at an interim stage in an evolving process. See Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction S3532.1 n.16 & accompanying text (2d ed. 1984 & Supp. 1998).
 
 
 11
 The D.C. Circuit, which decides most petitions for review of federal agency actions, explained:
 
 
 12
 The primary focus of the ripeness doctrine as applied to judicial review of agency action has been a prudential attempt to time review in a way that balances the petitioner's interest in prompt consideration of allegedly unlawful agency action against the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.
 
 
 13
 Mississippi Valley Gas Co. v. Federal Energy Regulatory Comm'n (MVGC), 68 F.3d 503, 508 (D.C. Cir. 1995) (quoting Eagle-Picher Indus. v. EPA, 759 F.2d 905, 915 (D.C. Cir. 1985)) (internal quotation marks omitted).
 
 
 14
 "In considering whether a case is ripe for review, a court must evaluate `[1] the fitness of the issues for judicial decision and [2] the hardship to the parties of withholding court consideration.' " Winter v. California Med. Review, Inc., 900 F.2d 1322, 1325 (9th Cir. 1990) (quoting Abbott, 387 U.S. at 149). "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final." Standard Alaska Prod. Co. v. Schaible, 874 F.2d 624, 627 (9th Cir. 1989). "To meet the hardship requirement, a litigant must show that withholding review would result in direct and immediate hardship and would entail more than possible financial loss. " Winter, 900 F.2d at 1325 (internal quotation marks omitted).
 
 
 15
 a. Fitness of Issues for Judicial Decision
 
 
 16
 We conclude that US West's challenge to the interim rates is not yet fit for judicial decision. First, we cannot determine whether these rates are final since the Commission may not have reached a final decision on the rates that will be charged during the period between the effective date of the agreements and the establishment of permanent rates. The Commission adopted a two-stage process for fixing interconnection rates: interim rates were to be set by arbitration; permanent rates were to be determined in a generic price proceeding. The generic proceeding is still underway. US West challenges the interim rates, but says its concerns would be resolved if TCG and MFS were ordered to compensate US West for any differences between the interim rates and the permanent prices, referred to as an "administrative true-up." US West apparently requested a true-up in arbitration proceedings. The arbitrators' orders cryptically provide that the rates in the agreements "will remain in effect pending the outcome of the Commission's generic pricing proceeding. " The Commission's orders approving the arbitrated agreements are similarly ambiguous: "The prices contained in the Agreement are interim prices, subject to replacement by prices adopted in the Commission's generic cost and price proceeding .. . ." When asked at oral argument to clarify whether a true-up mightbe available, the Commission was noncommital. Therefore, we must conclude that there is still a possibility the Commission will award a true-up at the conclusion of the generic price proceeding.
 
 
 17
 Accordingly, we avoid unnecessary adjudication by declining to review the interim prices now.[6] If a true-up is ordered, this appeal might become moot, as US West has indicated it would be satisfied with such an order. Even if the appeal does not become moot, either because the true-up is denied or because MFS or TCG appeals the award of a true up, this court will benefit from the Commission's and the district court's legal analysis of whether a true-up is authorized by the Act and from their assessment of whether it should be imposed in these particular cases. Indeed, TCG indicated at oral argument that it may challenge the legitimacy of the generic price proceeding itself. It may assist us to have all of these legal questions presented at once, after they have been fully considered below and after the factual record has been fully developed in the generic price proceeding. See MVGC, 68 F.3d at 508 (concluding that the court "will benefit from deferring review until the agency's policies have crystallized and the question[s] arise[ ] in some more concrete and final form") (internal quotation marks omitted).
 
 
 18
 b. Hardship to the Parties
 
 
 19
 Delaying review of the interim rates will not impose an undue hardship on any of the parties. US West indicated at oral argument that it would not object to deferred review, as long as it may renew its appeal at the conclusion of the generic proceeding if the Commission denies a true-up. Clearly, US West may do so. Cf. MVGC, 68 F.3d at 509 (explaining that at the conclusion of rate making, the court will have "jurisdiction to review the entire proceeding").
 
 
 20
 TCG objects to continued uncertainty regarding the rates it must pay to US West, which affect the rates it charges its customers. TCG notes that it entered the local phone market and conducted business based on the approved agreements and the interim rates they fixed, and the generic proceeding may not conclude before the agreements expire. TCG has known, however, that the rates were subject to judicial review and might be revised in the generic proceeding, at least prospectively. Delay alone ordinarily is not a sufficient hardship to preclude a finding of unripeness. See Pennzoil Co. v. FERC, 645 F.2d 394, 399-400 (5th Cir. 1981) (holding that mere delay is an inadequate showing of hardship, absent showing that delay will result in irreparable losses, intrusion into daily business decision-making, or the imposition of a Hobson's choice of whether to comply with a possibly invalid regulation or to violate it in order to challenge it).
 
 
 21
 Moreover, it is unclear whether declining to review the rates now will significantly delay a final resolution. At oral argument, the parties informed us that the generic proceeding was almost completed. Once it is completed, and following review in the district court, an accelerated schedule for briefing and argument can be set.
 
 
 22
 Finally, TCG and MFS do not suffer undue hardship since they might be more prejudiced by immediate review of the interim rates than by a possible true-up. It appears that the permanent prices ultimately adopted in the generic price proceeding are likely to be lower than US West's proposed prices. However, if this court in a later appeal of the generic proceeding were to determine that a TCG or MFS proposal adopted in the arbitrated agreements did not comply with the Act, one practical alternative might be to order the Commission to adopt the US West proposal in its place. Therefore, TCG and MFS may actually benefit from our decision to delay review until the conclusion of the generic proceeding.
 
 
 23
 We conclude that the possible hardship caused by deferring review is outweighed by the factors favoring deferral.
 
 2. Charges for Interim Number Portability
 
 24
 US West argues the district court erred in affirming the interim number portability provisions in the agreements because the assignment of costs based on the number of each exchange carrier's active local numbers violates the Act. The district court upheld the Commission's approval of the provisions because the FCC had approved the methodology. We affirm.
 
 
 25
 The Act requires US West to provide number portability, defined as the "ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another." 47 U.S.C. S 153(30). The Act provides that "the costs of establishing . . . number portability shall be borne by all telecommunications carriers on a competitively neutral basis as determined by the [FCC] ." 47 U.S.C. S 251(e)(2) (emphasis added). The FCC has ruled that a mechanism assigning costs based on each exchange carrier's active local numbers is "competitively neutral," see In re Telephone Number Portability, 11 F.C.C.R. 8352,P 135 (July 2, 1996) (Number Portability Order), but a mechanism requiring new entrants to bear all the costs of number portability is not. See id. at P 138. The FCC order is not subject to collateral attack in this proceeding. The Hobbs Act grants exclusive jurisdiction to courts of appeals to determine the validity of all final orders of the FCC. See 28 U.S.C. S 2342; 47 U.S.C. S 402(a); see also FCC v. ITT World Communications, 466 U.S. 463, 468-69 (1984); Wilson v. A. H. Belo Corp., 87 F.3d 393, 397-400 (9th Cir. 1996). An aggrieved party may invoke this jurisdiction only by filing a petition for review of the FCC's final order in a court of appeals naming the United States as a party. See 28 U.S.C. SS 2342, 2344.
 
 
 26
 US West also argues that mandatory sharing of switched access charges required by the MFS Agreement violates the Act. The district court upheld the Commission's approval of a provision requiring US West to share these charges because the Act and the FCC's Number Portability Order permit such sharing.
 
 
 27
 Switched access charges are fees paid by interexchange (long distance) carriers to local exchange carriers for transporting long distance telephone calls over the local exchange carrier's networks to complete the calls. The MFS Agreement requires US West to share with MFS all access charges paid by interexchange carriers to US West, including charges for local transport, local switching, interconnection, and a common carrier line charge. US West argues it should be required to share only the common carrier line charge because MFS provides only final call termination.
 
 
 28
 The Act states the cost of establishing the number portability system must be borne by all carriers on a "competitively neutral basis." 47 U.S.C. S 251(e)(2). The FCC's Number Portability Order stated the "overarching principle is that the carriers are to share in the access revenues received for a ported call."Number Portability Order at P 140. The Number Portability Order does not require that US West recover all its costs relating to number portability, but only that all carriers share the costs.
 
 
 29
 The district court correctly held that the number portability cost recovery provisions do not violate the Act.
 
 
 30
 3. Requirement to Combine Unbundled Elements
 
 
 31
 The district court's holding sustaining the provision in the MFS Agreement requiring US West to combine unbundled network elements at MFS's request before leasing must be affirmed under the rationale of AT & T Corp. v. Iowa Utilities Bd., 525 U.S. 366, 119 S. Ct. 721, 736-38 (1999), sustaining a provision prohibiting an incumbent from separating already combined elements before leasing.[7]
 
 
 32
 The Act states that an incumbent carrier must provide
 
 
 33
 nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms and conditions that are just, reasonable, and nondiscriminatory . . . . An incumbent local exchange carrier shall provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.
 
 
 34
 47 U.S.C. S 251(c)(3) (emphasis added).
 
 
 35
 In sustaining a provision that prohibited the incumbent from separating already-combined elements before leasing, the Supreme Court held that the phrase, "on an unbundled basis," does not necessarily mean "physically separated"; an equally reasonable interpretation is that it means separately priced. AT & T, 119 S. Ct. at 737. The Court also held that the statutory language requiring incumbent carriers to "provide such unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service" indicates that network elements may be leased in discrete parts, but "does not say, or even remotely imply, that elements must be provided only in this fashion and never in combined form." Id. It follows, the Court held, that the FCC regulation prohibiting an incumbent carrier from separating already-combined network elements, see 47 C.F.R. S 51.315(b), was not inconsistent with the Act.
 
 
 36
 It also necessarily follows from AT & T that requiring US West to combine unbundled network elements is not inconsistent with the Act: the MFS combination provision does not conflict with the Act because the Act does not say or imply that network elements may only be leased in discrete parts.
 
 
 37
 US West nevertheless argues that the Eighth Circuit's invalidation of the FCC regulation that required incumbent carriers to combine unbundled elements for competing carriers, see 47 C.F.R. S 51.315(c)-(f), requires this court to conclude that the MFS combination provision violates the Act. The Supreme Court opinion, however, undermined the Eighth Circuit's rationale for invalidating this regulation. Although the Supreme Court did not directly review the Eighth Circuit's invalidation of S 51.315(c)-(f), its interpretation of 47 U.S.C. S 251(c)(3) demonstrates that the Eighth Circuit erred when it concluded that the regulation was inconsistent with the Act. We must follow the Supreme Court's reading of the Act despite the Eighth Circuit's prior invalidation of the nearly identical FCC regulation.
 
 
 38
 4. Inclusion of Deregulated/Unregulated Services
 
 
 39
 US West argues the district court erred in failing to exempt deregulated and unregulatedservices from the resale provisions of the MFS Agreement.
 
 
 40
 The FCC instructed the parties to examine the incumbent carrier's retail tariffs to determine which services the incumbent carrier must provide for resale. See Local Competition Order at P 872 ("State commissions,[incumbent carriers] and resellers can determine the [telecommunications] services that an [incumbent carrier] must provide at wholesale rates by examining that [local exchange carrier's] retail tariffs.") (emphasis added). The Local Competition Order , however, only tells the parties they may examine the incumbent's retail tariffs to determine which services an incumbent carrier must provide for resale, and does not say a state commission may impose the duty to sell for resale only telecommunications services covered by the incumbent's retail tariffs. See id.
 
 
 41
 The plain language of the Act imposes on incumbent carriers the duty "to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. S 251(c)(4)(A) (emphasis added). The plain language does not exempt unregulated and deregulated services from the statutory definition of telecommunication services[8] or the duty to sell those services for resale. "If the intent of Congress is clear from the face of the statutory language, we must give effect to the unambiguously expressed Congressional intent." Saipan Stevedore Co., Inc. v. Director, Office of Workers Compensation Programs, 133 F.3d 717, 722 (9th Cir. 1998) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43 (1984)).
 
 
 42
 We affirm the district court's decision that deregulated and unregulated telecommunication services are subject to the resale provisions.
 
 5. Inclusion of ISP-Bound Traffic
 
 43
 US West argues the district court erred in permitting the inclusion of "ISP-Bound Traffic" (a telephone call froman end-user to the end-user's Internet Service Provider[9]) in the reciprocal compensation provisions of the MFS Agreement. The FCC has held parties are bound by interconnection agreements that include ISP-Bound Traffic in their reciprocal compensation provisions and are approved by a state commission. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996: Inter-Carrier Compensation for ISP-Bound Traffic, 14 F.C.C.R. 3689 (Feb. 26, 1999) (ISP Ruling). Because the Commission has approved the MFS Agreement which provided reciprocal compensation for ISP-Bound Traffic, we affirm.
 
 
 44
 The Act imposes a duty upon all incumbent carriers to "establish reciprocal compensation arrangements for the transport and termination of telecommunications. " 47 U.S.C. S 251(b)(5). The FCC concluded that the reciprocal compensation provisions applied only to "local telecommunications traffic." Local Competition Order atP 1412. The FCC issued a declaratory ruling that "ISP-Bound Traffic is jurisdictionally mixed and appears to be largely interstate." ISP Ruling at P 1. At first glance, the FCC's conclusion that ISP-BoundTraffic is interstate supports the exclusion of ISP-Bound Traffic from the reciprocal compensation provisions. Arguably, if ISPBound Traffic is interstate, it cannot also be " local telecommunications traffic." Local Competition Order at P 1412 (emphasis added). However, the FCC held the existing interconnection agreements providing for reciprocal compensation of ISP-Bound Traffic were binding on the parties.[10] The FCC said:
 
 
 45
 [Our jurisdictional] conclusion, however, does not in itself determine whether reciprocal compensation is due in any particular instance . . . . [P]arties may have agreed to reciprocal compensation for ISPbound Traffic, or a state commission, in the exercise of its authority to arbitrate interconnection disputes under section 252 of the Act, may have imposed reciprocal compensation obligations for this traffic. In the absence, to date, of a federal rule regarding the appropriate inter-carrier compensation for this traffic, we therefore conclude that parties should be bound by their existing interconnection agreements, as interpreted by state commissions.
 
 ISP Ruling at P 1 (emphasis added).[11]
 
 46
 US West may not collaterally attack the FCC's decision that parties are bound by existing interconnection agreements.[12] As noted, the Hobbs Act grants exclusive jurisdiction to courts of appeals to determine the validity of all final orders of the FCC.[13] See 28 U.S.C. S 2342; 47 U.S.C. S 402(a); see also ITT World Communications, 466 U.S. at 468-69. It is irrelevant that US West filed this action with the district court prior to the issuance of the ISP Ruling. "Once the [ISP Ruling] became final, it divested [this court] of jurisdiction to consider the issues decided in the [ISP Ruling]." Wilson, 87 F.3d at 400.
 
 
 47
 We affirm the district court's decision to include ISPBound Traffic in MFS Agreement's reciprocal compensation provisions because the ISP Ruling requires US West and MFS to be bound by the MFS Agreement which includes ISPBound Traffic in its reciprocal compensation provisions.[14]
 
 
 48
 6. Treatment of MFS Switch as a Tandem Switch
 
 
 49
 US West argues that the district court erred in characterizing the MFS switch as a tandem switch. Both MFS and US West presented evidence in the arbitration hearing regarding the geographic area the MFS switch serves and the functions it performs. The Commission's classification of MFS's switch as a tandem switch was not arbitrary or capricious.[15] The Commission properly considered whether MFS's switch performs similar functions and serves a geographic area comparable to US West's tandem switch. See Local Competition Order at P 1090. The Commission found that MFS's switch "is comparable in geographical scope" to US West's tandem switch, and "performs the function of aggregating traffic from widespread remote locations" as a tandem switch does.
 
 
 50
 US West challenges the rates the Commission required it to pay MFS for using its tandem switch, claiming they are not "reasonable approximations" of the additional costs MFS will incur for terminating US West's calls as required by 47 U.S.C. S 252(d)(2). The rates adopted by the Commission were the rates US West proposed for terminating MFS's calls. Though US West and MFS will not incur precisely the same costs for terminating the other carrier's calls, the district court held the rates were "reasonable approximations " of the additional costs incurred by MFS, and therefore complied with the Act. We affirm.
 
 7. Interconnection at Certain Points
 
 51
 US West argues the district court erred in upholding provisions in the MFS Agreement permitting a single point of interconnection (at the tandem switch) per local access and transport area, and in upholding provisions in the TCG Agreement permitting TCG to interconnect at US West access tandem switches and at local and end office switches.
 
 
 52
 The Act requires an incumbent carrier to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network -(A) for the transmission and routing of telephone exchange service and exchange access; (B) at any technically feasible point within the carrier's network.
 
 
 53
 47 U.S.C. S 251(c)(2) (emphasis added).
 
 
 54
 The plain language requires local exchange carriers to permit interconnection at any technically feasible point within the carrier's network. An incumbent carrier denying a request for interconnection at a particular point must prove interconnection at that point is not technically feasible. See 47 C.F.R. S 51.305(e). US West provided no evidence that interconnection at its tandem or local or end office switches was not technically feasible. In any event, these regulations state that interconnection at a tandem switch is technically feasible, see 47 C.F.R. S 51.305(a)(2)(iii), and these regulations are not subject to collateral attack in this proceeding. See 28 U.S.C. S 2342(1); ITT World Communications, 466 U.S. at 468-69.
 
 8. Combination of Toll and Local Traffic
 
 55
 US West argues the district court erred in upholding the provisions in the TCG Agreement permitting TCG to combine local and toll traffic on two-way trunks. The FCC regulations require an incumbent carrier to provide two-way trunking where the competing carrier has insufficient traffic to justify use of separate one-way trunks and two-way trunking is technically feasible. See Local Competition Order at P 219; see also 47 C.F.R. S 51.305(f)("If technically feasible, an incumbent [carrier] shall provide two-way trunking upon request."). The regulation is not subject to collateral attack in this proceeding. See 28 U.S.C. S 2342(1); ITT World Communications, 466 U.S. at 468-69.
 
 
 56
 9. Providing Adequate Security at Collocation Sites
 
 
 57
 Because of the sensitive nature of the technology at incumbent carriers' facilities, the FCC permits incumbent carriers to "require reasonable security arrangements" to separate a collocating carrier's space from the incumbent carrier's facilities. 47 C.F.R. S 51.323(i). US West proposed providing escorts, at TCG's expense, while TCG employees were in US West's facilities. The Commission concluded less costly arrangements would be adequate, and adopted TCG's proposal to permit US West to require screening and bonding in reasonable amounts for TCG personnel in US West facilities.
 
 
 58
 We affirm the district court's holding that the bonding and screening provision provided a "reasonable " security arrangement as required by the Act and its implementing regulations. See 47 U.S.C. S 251(c)(6); 47 C.F.R. S 51.323(i). This is the same security standard US West imposes on its own workforce. The Commission's decision that this arrangement was preferable to US West's suggestion of escorts was not arbitrary and capricious.
 
 
 59
 10. Requiring US West to Enter Into Future Agreement on Access to Poles, Conduits, Ducts, Rights of Way
 
 
 60
 We uphold a provision in the TCG Agreement[16] requiring TCG and US West to negotiate a future agreement for pole attachment and conduit usage as an "appropriate condition" to implement the statutory duty of US West to afford access to poles, ducts, conduits and rights-of-way. See 47 U.S.C. SS 251(b)(4); 252(b)(4)(C); 252(c)(1). US West argues that the Commission may impose the duty, but may not require US West to enter into a future agreement to provide such access.
 
 
 61
 State commissions impose "appropriate conditions as required" only to "ensure that such resolutions and conditions meet the requirements of section 251." 47 U.S.C. SS 252(b)(4)(C), 252(c)(1). Section 251 lists many duties of incumbent carriers, including the "duty to afford access to the poles, ducts, conduits, and rights-of-way of the [incumbent] carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224." 47 U.S.C. S 251(b)(4).
 
 
 62
 Because US West and TCG could not agree to a provision regarding US West's duty to afford TCG access to poles and conduits, requiring the parties to enter into a future agree
 
 
 63
 ment was appropriate to ensure US West fulfills its duty to provide access.[17]
 
 Takings Claims
 
 64
 US West argues that the Commission's imposition of arbitration terms constituted a taking of US West's property without just compensation, because the rates included in the agreements do not provide for full cost recovery. The district court concluded this Fifth Amendment claim was not ripe and dismissed it. We affirm.
 
 
 65
 In Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985), the Supreme Court held that a regulatory taking claim against a state is not ripe until (1) the state agency imposing the allegedly confiscatory regulation has taken final action against the plaintiff's property and (2) the plaintiff has pursued all available remedies under state law. See id. at 186-97. Because the rates included in the agreements approved by the Commission are interim rates and US West may receive retroactive compensation for the interim period, the agency has not taken final action on the allegedly confiscatory rates and the takings claim is not ripe. Moreover, because Washington law provides a remedy for takings, see Washington State Const. art. I,S 16; see also, Manufactured Housing Communities v. Washington, 951 P.2d 1142 (Wash. App. 1998), US West must pursue that remedy before bringing an action under the Fifth Amendment in federal court.
 
 
 66
 US West argues that the Act effects a physical taking of its property, rather than a regulatory taking, but does not explain how this difference affects the ripeness of its claim. A court often must await final agency action before it can determine if a taking has occurred, because it must assess whether the regulation has deprived the property owner of all economically viable use of the property. In physical taking cases, whether a taking has occurred usually is not disputed. Even if the taking is established, however, a taking claim is not ripe until the state has taken final action on the plaintiff's request for just compensation. No court could determine whether US West will receive just compensation until the pricing issues have been finally resolved. Even after the Commission approves permanent prices, US West must pursue its state remedies before a federal court can determine whether the state has provided just compensation.[18]
 
 
 67
 We affirm the district court's dismissal of US West's takings claims because they are not ripe for review.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Milton I. Shadur, Senior United States District Judge, Northern District of Illinois, sitting by designation.
 
 
 [2]
 A "network element" is a facility or equipment used in the provision of telecommunications service. See 47 U.S.C.S 153(29).
 
 
 [3]
 US West argues that we should not defer to the Commission on any of its rulings because section 252(e)(6) provides for a private right of action instead of an appeal to the district court. All district court proceedings are initiated by filing an "action" in district court. See Fed. R. Civ. P. 1, 2 & 3. Congress' use of this term in section 252(e)(6) does not affect the proper standard of review.
 
 
 [4]
 The district court erred in applying the arbitrary and capricious standard to the following issues relating to the agreements' compliance with the Act: (1) charges for number portability, infra at 12481; (2) inclusion of deregulated or unregulated services, infra at 12485; (3) inclusion of ISP-Bound Traffic, infra at 12486; (4) interconnection at certain points, infra at 12490; and (5) combination of toll and local traffic, infra at 12491.
 
 
 [5]
 The district court erred in holding that the doctrine of primary jurisdiction required substantial deference to the Commission's price determination and cost methodology. The doctrine of primary jurisdiction is not applicable. This is not a judicial action independent of agency proceedings. See Cost Management Serv., Inc. v. Washington Natural Gas Co., 99 F.3d 937, 949 (9th Cir. 1996). However, the error was harmless.
 
 
 [6]
 Compare MVGC, 68 F.3d at 509 (finding petition for review unripe in part because of "the possibility that MVGC will obtain relief from the effect of the [challenged] FERC orders in the pending hearings"), and Placid Oil Co. v. FERC, 666 F.2d 976, 981 (5th Cir. 1982) (finding petition for review unripe in part because the agency "may have been receptive" to the petitioner's argument in a subsequent proceeding), with United Distribution Cos. v. FERC, 88 F.3d 1105, 1183 (D.C. Cir. 1996) (finding petition for review ripe in part because agency had demonstrated that it did not intend to reconsider the relevant ruling or amplify its justifications for the ruling in further proceedings); Mid-Tex Elec. Coop., Inc. v. FERC, 773 F.3d 327, 337-38 (D.C. Cir. 1985) (finding petition for review ripe in part because the agency informed the court that the challenged order was the agency's definitive ruling on the relevant issue: "Here the Commission states that its rule binds it to accept rates calculated with CWIP in the rate base; its discretion has been exercised and no longer exists.").
 
 
 [7]
 The MFS provision states: "USWC agrees to perform and MFS agrees to pay for the functions necessary to combine requested elements in any technically feasible manner either with other elements from [US West's] network, or with elements possessed by MFS."
 
 
 [8]
 A "telecommunications service " is defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. S 153(46).
 
 
 [9]
 An Internet service provider (ISP) "is an entity that provides its customers the ability to obtain on-line information through the Internet. ISPs purchase analog and digital lines from local exchange carriers to connect to their dial-in subscribers. Under one typical arrangement, an ISP customer dials a seven-digit number to reach the ISP server in the same local calling area. The ISP, in turn, combines computer processing, information storage, protocol conversion, and routing with transmission to enable users to access Internet content and services." In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996: Inter Carrier Compensation for ISP-Bound Traffic, 14 F.C.C.R. 3689 at P 4 (Feb. 26, 1999).
 
 
 [10]
 In the ISP Ruling, the FCC gave notice of a proposed rulemaking regarding inter-carrier compensation for ISP-Bound Traffic. The obligation to pay such compensation in existing interconnection agreements could be altered by future rules promulgated by the FCC.
 
 
 [11]
 The FCC stated that the ISP Ruling "might cause some state commissions to reexamine their conclusion that reciprocal compensation is due." ISP Ruling at P 27. Even if the Commission did reconsider its conclusion that reciprocal compensation is due under the MFS Agreement, the parties could not attack the reciprocal compensation provisions in this forum. See Wilson v. A.H. Belo Corp., 87 F.3d 393, 400 (9th Cir. 1996). In fact, the Commission did reconsider its conclusion and held reciprocal compensation is due for ISP-Bound Traffic. See WorldCom v. GTE Northwest, Inc., 1999 WL 983858 (Wash.U.T.C. May 12, 1999)
 
 
 [12]
 US West argues that the FCC "abdicated its responsibility" by finding that even though ISP-Bound Traffic is jurisdictionally interstate, parties under existing interconnection agreements approved by state commissions must pay inter-carrier compensation for ISP-Bound Traffic (if such traffic is included in the reciprocal compensation provisions). However, this argument should be made in a direct attack of the ISP Ruling. In fact, US West and other telecommunications carriers have filed such actions in the D.C. Circuit seeking direct review of the ISP Ruling. See US West v. FCC, No. 99-1095 (filed March 8, 1999); Bell Atlantic v. FCC, No. 99-1094 (D.C. Cir. filed March 8, 1999); MCI Worldcom v. FCC, No. 99-1097 (D.C. Cir. filed March 8, 1999).
 
 
 [13]
 US West argues that the Hobbs Act does not apply because section 252(e)(6) of the Act grants jurisdiction to federal district courts to determine whether the interconnection agreements comply with the Act and the FCC regulations. Section 252(e)(6) does not, however, grant jurisdiction to federal district courts to review the validity of FCC regulations.
 
 
 [14]
 Based on different reasoning, the Seventh Circuit also held the ISP Ruling did not prohibit a state commission from including ISP-Bound Traffic in the reciprocal compensation provisions of an interconnection agreement. See Illinois Bell Tel. Co. v. WorldCom Techs., 179 F.3d 566 (7th Cir. 1999). The Seventh Circuit held the ISP-Ruling permits state commissions to decide whether ISP Bound-Traffic should be included in the interconnection agreement's reciprocal compensation provisions "at least until the time a [federal] rule is promulgated." Id. at 574.
 
 
 [15]
 We review the Commission's decision under the arbitrary and capricious standard. Whether MFS's switch is a tandem switch is not a determination of compliance with the requirements of the Act and its implementing regulations.
 
 
 [16]
 The TCG Agreement states: "Parties agree to negotiate and execute a separate agreement for pole attachment and conduit usage within 30 days of either Party requesting the other to negotiate such an agreement."
 
 
 [17]
 Generally, an agreement to agree in the future is not enforceable. See Kapetan v. Kelso, 481 P.2d 24, 25 (Wash. App. 1971) (quoting Sandeman v. Sayres, 314 P.2d 428, 429 (Wash. App. 1957) ("An agreement for an agreement, or in other words, an agreement to do something which requires a further meeting of the minds of the parties and without which it would not be complete is unenforcible [sic]."); 1 Farnsworth on Contracts S 3.26 at 345 (1998) (generally an agreement to negotiate is not enforceable); 1 Williston on Contracts, S 4.26 at 585 (1990) (generally an agreement to agree is not enforceable). This general rule does not apply where a state commission, pursuant to a federal statute, arbitrates and makes a binding decision on terms which are included in an interconnection agreement. See 47 U.S.C. 252(b)(1). A "meeting of the minds" is not necessary to bind parties to the terms of an interconnection agreement which results from arbitration and a binding decision of a governmental agency.
 
 
 [18]
 US West argues it is not necessary to present its claims in state court before seeking relief in federal court, citing US West Communications, Inc. v. TCG Oregon, D.N. 97-858-JE (D. Or. 1998), reprinted in part in 98-35203 Blue Br. at App. 33-38 (relying on Dodd v. Hood River County, 59 F.3d 852 (9th Cir. 1995)). Dodd held that Williamson did not require plaintiffs to pursue Fifth Amendment takings claims in state court before seeking relief in federal court. See id. at 859. Williamson, we explained, only requires plaintiffs to pursue state remedies before bringing a Fifth Amendment claim. See id. As noted above, Washington law does provide an independent remedy for takings, and US West must pursue that remedy before seeking relief under the Fifth Amendment.