224 F.3d 1049 (9th Cir. 2000)
 US WEST COMMUNICATIONS, INC., Plaintiff-Appellee, and UNITED STATES OF AMERICA, Intervenor,
v.
ROGER HAMILTON, Chairman of the Oregon Public Utility Commission; RON EACHUS, Commissioner of the Oregon Public Utility Commission; JOAN H. SMITH, Commissioner of the Oregon Public Utility Commission; OREGON PUBLIC UTILITY COMMISSION; MCI METRO ACCESS TRANSMISSION SERVICES, INC.; SPRINT COMMUNICATIONS, Defendants,
and
AT&T COMMUNICATIONS OF THE PACIFIC NORTHWEST, INC., Defendant-Appellant.
US WEST COMMUNICATIONS, INC., Plaintiff-Appellee,
and
UNITED STATES OF AMERICA, Intervenor,
v.
ROGER HAMILTON, Chairman of the Oregon Public Utility Commission; RON EACHUS, Commissioner of the Oregon Public Utility Commission; JOAN H. SMITH, Commissioner of the Oregon Public Utility Commission; OREGON PUBLIC UTILITY COMMISSION; AT&T COMMUNICATIONS OF THE PACIFIC NORTHWEST, INC.; SPRINT COMMUNICATIONS, Defendants,
and
MCI METRO ACCESS TRANSMISSION SERVICES, INC., Defendant-Appellant.
US WEST COMMUNICATIONS, INC., Plaintiff-Appellee,
v.
WORLDCOM TECHNOLOGIES, INC., Defendant-Appellant.
 Nos. 99-35462, 99-35586, 99-35587.
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted July 12, 2000--Portland, Oregon
Filed September 13, 2000
Amended October 23, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: Michael C. Thompson, Joyce Grant, Russell P. Rowe, and Phillip L. Douglass, US West Law Department, Denver, Colorado; Sherilyn Peterson and Kirstin S. Dodge, Perkins Coie LLP, Bellevue, Washington, for appellant and cross-appellee US West Communications, Inc.
 Thomas F. O'Neil III and William Single, IV, MCI WorldCom, Inc., Washington, D.C., and Donald B. Verrilli, Jr., Maureen F. Del Duca, Jodie L. Kelley, and Cynthia Robertson, Jenner & Block, Washington, D.C., for appellees and cross-appellants MCI Telecommunications Corporation, MCImetro Access Transmission Services, Inc., and WorldCom Technologies, Inc.
 Daniel M. Waggoner, Martin L. Fineman, and Kraig L. M. Baker, Davis Wright Tremaine LLP, Seattle, Washington, and Thomas C. Pelto and Rebecca DeCook, AT&T Communications of the Pacific Northwest, Inc., Denver, Colorado, for appellees and cross-appellants AT&T Communications of the Pacific Northwest, Inc.
 Hardy Myers, Attorney General, Michael D. Reynolds, Solicitor General, and W. Benny Won, Assistant Attorney General of the State of Oregon, General Counsel Division, Salem, Oregon, for appellees Oregon Public Utility Commission and Commissioners Roger Hamilton, Ron Eachus, and Joan H. Smith.
 Theodore C. Hirt, US Attorney's Office, Washington, D.C., for Amicus Federal Communications Commission.
 Before: Alfred T. Goodwin, Susan P. Graber, and William A. Fletcher, Circuit Judges. Opinion by Judge W. Fletcher
 OPINION
 W. FLETCHER, Circuit Judge:
 
 
 1
 In these consolidated appeals, AT&T Communications of the Pacific Northwest ("AT&T"), MCI Metro Access Transmission Services ("MCI"), and WorldCom Technologies ("WorldCom") appeal district court judgments invalidating several provisions of arbitrated interconnection agreements with US West Communications ("US West")[1] pursuant to the Telecommunications Act of 1996 ("the Act"). We conclude that all the challenged provisions of the interconnection agreements are valid under the Act and its implementing regulations. We therefore reverse the district court's partial summary judgment invalidating those provisions.
 
 
 2
 * The Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56, codified in part at 47 U.S.C. ' 251-61, is designed to foster competition in local and long distance telephone markets by neutralizing the competitive advantage inherent in incumbent carriers' ownership of the physical networks required to supply telecommunication services. Sections 251 and 252 of the Act require incumbent local exchange carriers (ILECs) to allow competitive local exchange carriers (CLECs) to interconnect with their existing networks and to purchase their finished telecommunications service for resale in return for fair compensation. See 47 U.S.C. ' 251-52. The Act directs the ILECs and CLECs to negotiate in good faith to reach an agreement over the terms of the interconnection. See id. ' 251(c)(1), 252(a). If an ILEC and a CLEC are unable to agree, the Act provides for binding arbitration conducted under the aegis of the state public utilities commission. See id. 252(b). After a state commission approves an arbitrated agreement, any party to the agreement may bring an action in district court"to determine whether the agreement . . . meets the requirements " of the Act. Id. 252(e)(6).
 
 
 3
 In Oregon, US West is an ILEC; AT&T, MCI, and WorldCom are CLECs; and the Oregon Public Utilities Commission ("OPUC") is the state agency charged with arbitrating and approving interconnection agreements. Following unsuccessful negotiations with US West, all three CLECs petitioned OPUC for arbitration. OPUC arbitrated and ratified interconnection agreements between the parties.
 
 
 4
 US West challenged the agreements in district court. The cases were consolidated and heard by consent before a magistrate judge who decided them at summary judgment, upholding some provisions of the agreements and invalidating others. US West appealed, and AT&T, MCI, and WorldCom cross-appealed. US West subsequently dismissed its appeals. Only the cross-appeals remain.
 
 
 5
 We review de novo the district court's grant of summary judgment. See US West Communications v. MFS Intelenet, Inc. , 193 F.3d 1112, 1117 (9th Cir. 1999). In reviewing the district court's decision, we "apply the same standard the district court should apply" in reviewing OPUC's decision. Id. The Act vests district courts with jurisdiction to"determine whether the agreement[s] . . . meet[ ] the requirements" of the Act. 47 U.S.C. 252(e)(6). We therefore "consider[ ] de novo whether the agreements are in compliance with the Act and the implementing regulations, and consider[ ] all other issues under an arbitrary and capricious standard." MFS Intelenet, 193 F.3d at 1117 (footnote and internal citations omitted).
 
 II
 
 6
 Four issues are raised in these cross-appeals: (1) May US West be prevented from obtaining reciprocal access to the CLECs' poles, ducts, conduits, and rights-of-way under 47 U.S.C. ' 224 and 251(b)(4)? (2) May US West be required to allow MCI to collocate remote switching units on its premises under 47 U.S.C. 251(c)(6)? (3) Did the arbitrator act properly in requiring US West to use for inter-carrier billing the "IABS" system preferred by AT&T and MCI, rather than the "CRIS" system preferred by US West? (4) Did the district court err in remanding to OPUC for further consideration a provision requiring US West to bundle network elements? We consider these issues in turn.
 
 
 7
 * The challenged agreements include a provision that precludes US West from obtaining access to the CLECs' poles, ducts, conduits, and rights-of-way, even though US West must grant these same CLECs access to its own poles, ducts, conduits, and rights-of-way. OPUC upheld this provision, but the district court struck it down as inconsistent with the plain language of the Act.
 
 
 8
 There is no doubt that the Act obliges ILECs to grant CLECs access to their poles, ducts, conduits, and rights-ofway. See 47 U.S.C. 251(b)(4). There is considerable controversy, however, about whether this obligation is reciprocal -that is, whether CLECs must make their poles, ducts, conduits, and rights-of-way accessible to ILECs like US West.
 
 
 9
 On the one hand, 251(b) of the Act, entitled"Obligations of all local exchange carriers," provides that"[e]ach local exchange carrier" has the duty "to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224[of this title]." 47 U.S.C. 251(b)(4). If 251(b) were the only applicable section, it would appear to settle the question in favor of reciprocal access, for under its plain language all "local exchange carriers," whether ILECs or CLECs, must grant access.
 
 
 10
 On the other hand, 224, entitled "Pole attachments," requires a "utility [to] provide . . . any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it. " 47 U.S.C. 224(f)(1). Section 224(a) defines "utility" broadly enough to include both ILECs and CLECs, but it restricts the definition of "telecommunications carrier" -the entity entitled to access -so that CLECs but not ILECs qualify. According to that section, " `utility' means any person who is a local exchange carrier or an electric, gas, water, steam, or other public utility . . . . [T]he term `telecommunications carrier' . . . does not include any incumbent local exchange carrier . . . ." 47 U.S.C. ' 224(a)(1), (5). Section 224 casts doubt on whether the duty under 251(b)(4) is truly a reciprocal one, particularly given the cross-reference in 251(b)(4) to 224.
 
 
 11
 The FCC addressed this ambiguity in & 1231 of its first Local Competition Order, which it released in August 1996. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order, 11 F.C.C. Rcd. 15499 (released Aug. 8, 1996) ("First Local Competition Order" or "Order"). The Order provides:
 
 
 12
 [I]ncumbent LECs cannot use section 251(b)(4) as a means of gaining access to the facilities or property of a LEC. A LEC's obligation under section 251(b)(4) is to afford access "on rates, terms, and conditions that are consistent with section 224. " Section 224 does not prescribe rates, terms, or conditions governing access by an incumbent LEC to the facilities or rights-of-way of a competing LEC. Indeed, section 224 does not provide access rights to incumbent LECs. We cannot infer that section 251(b)(4) restores to an incumbent LEC access rights expressly withheld by section 224. We give deference to the specific denial of access under section 224 over the more general access provisions of section 251(b)(4). Accordingly, no incumbent LEC may seek access to the facilities or rights-of-way of a LEC or any utility under either section 224 or section 251(b)(4).
 
 
 13
 First Local Competition Order & 1231.
 
 
 14
 We have serious doubts about the FCC's analysis. Because 251 and 224 were enacted at the same time and form part of the same Act, the duty to harmonize them is particularly acute. See Erlenbaugh v. United States, 409 U.S. 239, 244 (1972) ("The rule [of in pari materia] is but a logical extension of the principle that individual sections of a single statute should be construed together . . . . Given this underlying assumption, the rule's application certainly makes the most sense when the statutes were enacted by the same legislative body at the same time."). Unlike the FCC, we think these two sections can be read in harmony. Section 224 deals with all utilities, whereas 251(b)(4) concerns only telecommunications carriers. Section 224 allows CLECs, but not ILECs, access to the physical networks and rights-of-way of all other utilities, including those belonging to electric companies, gas companies, water companies, and the like. Because ILECs had their own physical networks and established rights-ofway when the Act was passed, Congress may have seen fit to grant access to non-carrier utilities' networks and rights-ofway only to CLECs. But in order to maintain a level playing field within the telecommunications industry itself, Congress reasonably could have granted reciprocal access among telecommunications carriers, ILECs and CLECs alike, by means of 251(b)(4). This reading gives full effect to the language of 224 and 251(b)(4) without creating a conflict between them.
 
 
 15
 Further, 251(b)(4) provides that a local exchange carrier must afford access "on rates, terms, and conditions that are consistent with 224." Section 224 specifies such things as how to determine "just and reasonable rates," 47 U.S.C. 224(d), how to apportion the costs of sharing pole space, see id. 224(e), how to make modifications to shared poles, see id. 224(h), and how to divide the "costs of rearranging or replacing attachment[s]," id. 224(i). These provisions clearly qualify as "rates, terms, and conditions. " We are not convinced that the definition of the kind of local exchange carrier entitled to access is similarly a "rate, term, or condition" within the meaning of 251(b)(4).
 
 
 16
 The district court concluded that & 1231 of the First Local Competition Order contradicted the statute, and it struck down the provisions of the interconnection agreements barring reciprocal access. Although we share the district court's discomfort with the FCC's interpretation of ' 224 and 251(b)(4), we do not agree that we may invalidate the provisions of the agreements that conflict with these sections but conform to & 1231 of the First Local Competition Order. The Hobbs Act, 28 U.S.C. 2342, gives the federal courts of appeals "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47. " Id. Section 402(a), in turn, encompasses "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission under [the Communications Act of 1934, as amended by the Telecommunications Act of 1996]," with exceptions not relevant here. Together, these two statutes "vest the courts of appeals with exclusive jurisdiction to review the validity of FCC rulings." Wilson v. A.H. Belo Corp., 87 F.3d 393, 396-97 (9th Cir. 1996). Aggrieved parties may invoke this exclusive jurisdiction "only by filing a petition for review of the FCC's final order in a court of appeals naming the United States as a party." MFS Intelenet, 193 F.3d at 1120; see also 28 U.S.C. ' 2342, 2344.
 
 
 17
 The parties in this case did not file a Hobbs Act petition in this court. Several parties in other cases did petition for review of the FCC's First Local Competition Order in other courts of appeals. Pursuant to 28 U.S.C. 2112(a), the multidistrict litigation panel consolidated these petitions and assigned them to the Eighth Circuit. See 28 U.S.C. 2112(a)(3). As the Fourth Circuit recently explained, "[t]hat circuit is now the sole forum for addressing challenges to the validity of the FCC's [First Local Competition Order]." GTE South, Inc. v. Morrison, 199 F.3d 733, 743 (4th Cir. 1999); see also 28 U.S.C. 2112(a)(5).
 
 
 18
 US West argues, however, that & 1231 is not a "final order" of the FCC and that the Hobbs Act therefore does not bar our review. We are not persuaded. In Sierra Club v. United States Nuclear Regulatory Commission, 862 F.2d 222 (9th Cir. 1988), we held that agency orders are"final orders" for the purposes of the Hobbs Act "if they impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." Id. at 225. In 1997, the Supreme Court held that,
 
 
 19
 [a]s a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the consummation of the agency's decisionmaking process -it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.
 
 
 20
 Bennett v. Spear , 520 U.S. 154, 177-78 (1997) (internal quotation marks and citations omitted). Admittedly, Bennett was not a Hobbs Act case. There, the question was whether a particular report constituted "final agency action " sufficient to invoke review under the Administrative Procedures Act ("APA"). See id. We agree with the Seventh Circuit, however, that a "final agency action" under the APA is analytically equivalent to a "final order" under the Hobbs Act. See American Trucking Ass'n, Inc. v. United States, 755 F.2d 1292, 1296 (7th Cir. 1985). Thus, Bennett governs our understanding of "final order" for the purposes of the Hobbs Act as well.
 
 
 21
 In light of the Bennett factors, & 1231 must be understood as a final order subject to the Hobbs Act. Paragraph 1231 is neither "tentative" nor "interlocutory." Tentative FCC rulings are aptly titled "Notice of Proposed Rulemaking" (emphasis added). Such a notice, in fact, preceded the Local Competition Order at issue in this case. See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 , Notice of Proposed Rulemaking, FCC 96182 (released Apr. 19, 1996), 61 Fed. Reg. 18311 (Apr. 25, 1996). The fact that Congress allowed the FCC six months within which to "establish regulations to implement the requirements of [the Act]," 47 U.S.C. 251(d)(1), coupled with the fact that the FCC issued the Local Competition Order precisely six months after the Act passed, further confirms the Order's finality. Moreover, & 1231 determines rights and gives rise to legal consequences. Twice in the space of one short paragraph it explicitly prohibits reciprocal access for ILECs: "[I]ncumbent LECs cannot use section 251(b)(4) as a means of gaining access to the facilities or property of a LEC . . . . [N]o incumbent LEC may seek access to the facilities or rights-of-way of a LEC or any utility under either section 224 or section 251(b)(4)." First Local Competition Order & 1231.
 
 
 22
 Finally, US West contends that the Hobbs Act does not apply to & 1231 because it is an "interpretive" rather than a "legislative" rule. Even assuming that & 1231 is an interpretive rule, we find no support for the proposition that it therefore falls outside the ambit of the Hobbs Act. The Hobbs Act itself contains no exception for "interpretive " rules, and case law does not create one.[2] What scant case law there is suggests that "final orders" include both interpretive and legislative orders. See, e.g., Federal Trade Comm'n v. Standard Oil Co. , 449 U.S. 232, 246 (1980) (Stevens, J., concurring) ("[A]gency action . . . encompasses formal orders, rules, and interpretive decisions that crystalize or modify private legal rights."); New England Power Co. v. United States Nuclear Regulatory Comm'n , 683 F.2d 12 (1st Cir. 1982) (reviewing an interpretive rule of the Nuclear Regulatory Commission under the Hobbs Act).
 
 
 23
 In sum, although we doubt the soundness of the FCC's interpretation of the ' 251(b)(4) and 224 of the Act contained in & 1231 of the First Local Competition Order, we are not at liberty to review that interpretation. We are required by the Hobbs Act to apply & 1231 as it is written and to uphold the provisions in the parties' agreements prohibiting reciprocal access.
 
 B
 
 24
 Section 251(c)(6) of the Act obliges ILECs to permit "physical collocation of equipment necessary for interconnection or access." 47 U.S.C. 251(c)(6). OPUC ratified an agreement requiring US West to allow MCI to collocate remote switching units ("RSUs") on US West's premises. The district court remanded this provision to OPUC for further consideration. We settled this question in MCI Telecommunications Corp. v. US West, 204 F.3d 1262 (9th Cir. 2000), where we held that the Act permits a state commission to require collocation of RSUs on the ILEC's premises. The district court's remand was therefore erroneous.
 
 C
 
 25
 As a result of the Act, parties to interconnection agreements, though competitors, must cooperate with each other. Among other things, cooperation requires that they adopt some mutually agreeable billing format. Because the parties in this case could not agree to such a format, the issue was arbitrated. After considering testimony regarding two billing systems, "CRIS" and "IABS," the arbitrator chose IABS. OPUC ratified this decision, but the district court remanded to OPUC for further consideration. It wrote, "US West already uses CRIS as its billing software, and sees no reason it should switch to another software program, and incur what it contends would be substantial costs to modify its systems to retrain its employees, merely because AT&T/ MCI prefer IABS." In the district court's view, requiring US West to switch from CRIS to IABS was tantamount to requiring US West to upgrade its system to suit its competitors, which the Act does not require. See Iowa Utils. Bd. v. FCC , 120 F.3d 753, 812 (8th Cir. 1997).
 
 
 26
 We disagree. The question on this record is not whether US West should have to switch to a new billing format for the benefit of its competitors, but rather which of the two billing systems it currently employs should be modified for the purpose of inter-carrier billing. US West's own witness, Lynn Notarianni, testified that US West uses both IABS and CRIS and that either would have to be substantially overhauled for the carrier-to-carrier billing that is now required. Ms. Notarianni testified that US West favored modifying the CRIS system even though that would entail a cost of about $8.5 million, whereas modifying IABS would cost about $5 million.
 
 
 27
 Because nothing in the Act requires the selection of a particular billing system, OPUC's decision must be sustained unless it is arbitrary and capricious. See MFS Intelenet, 193 F.3d at 1117. Under this standard of review, the selection of IABS must be upheld. The arbitrator noted that the IABS system "will best facilitate competitive entry without compromising the goal of developing standardized, national interfaces," in part because IABS "is a standard nationally recognized [for] carrier-to-carrier billing. " By contrast, the CRIS system is a proprietary US West system. US West has not shown that the arbitrator's actions show a "clear error of judgment." Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 573 (9th Cir. 1998).
 
 D
 
 28
 US West's agreements with AT&T, MCI, and WorldCom require it to provide network elements "individually and in combination with" other network elements. On June 19, 2000, OPUC revised its position on "bundling" network elements. See In the Matter of the Investigation into Compliance Tariffs filed by US West Communications, Inc., Advice Nos. 1661, 1683, 1685, and 1690, and In the Matter of the Investigation into Compliance Tariffs filed by GTE Northwest Incorporated , Advice Nos. 589, 599, and 611, Order No. 00-316, Oregon Public Utilities Commission (June 19, 2000). In its June 19 order, OPUC stated that it would require ILECs to make available only those unbundled network elements included in the FCC's revised rules on unbundling requirements, see 47 C.F.R. 51.319 (2000), and that no additional requirements would be imposed until the requisite "necessary" and "impair" analysis was undertaken. See id. The legalityof the provision and combination of unbundled network elements, it is now moot.
 
 III
 
 29
 We uphold the provisions of the interconnection agreements forbidding reciprocal access to poles, ducts, conduits, and rights-of-way for ILEC US West; allowing RSU collocation by CLEC MCI; and selecting the IABS system for intercarrier billing. We therefore reverse the district court's decision to remand these provisions. Because the Oregon Public Utilities Commission has revised its position on bundling requirements, we vacate the district court's remand of this provision as moot.
 
 
 30
 REVERSED in part and VACATED in part.
 
 
 
 Notes:
 
 
 [1]
 US West has changed its name to Qwest since initiating these lawsuits.
 
 
 [2]
 Neither of the two cases cited by US West supports its contention that interpretive rules are not "final orders" within the meaning of the Hobbs Act. In National Tank Truck Carriers, Inc., v. Federal Highway Admin., 170 F.3d 203 (D.C. Cir. 1999), the court declined to exercise review under the Hobbs Act because the challenged provisions were not federal law; rather, they were interpretive guidelines issued by a private, nongovernmental organization that in no way altered federal law. See id. at 208 ("[T]he Hobbs Act gives this Court no authority to review the guidelines of a non-governmental organization such as the CVSA."). In American Broad. Cos., Inc. v. FCC, 662 F.2d 155 (2d Cir. 1981), the court declined to exercise its jurisdiction because the challenged agency action was "a preliminary decision within the Commission's exclusive discretion" that "[did] not result in a final order reviewable in this court." Id. at 157.